UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> v.    ) <br> ) <br> JOHN PATRICK O'NEILL,  ) <br> ) <br> Defendant.   ) <br> ) | Criminal No. 14-10317-WGY |

**GOVERNMENT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE PURSUANT TO SECTION 5K1.1**

The government respectfully submits this sentencing memorandum and motion, pursuant to Section 5K1.1 of the United States Sentencing Guidelines (the "Sentencing Guidelines"), to request that the Court depart from the applicable Sentencing Guidelines range of 24 to 30 months' imprisonment and impose a sentence of probation for a term of one year.

As the Court is aware, the defendant, John Patrick O'Neill, waived indictment and pled guilty, on December 4, 2014, to an Information charging him with one count of conspiracy to commit securities fraud arising out of a secret stock tip he provided to a friend, Robert Bray, concerning the imminent acquisition of Wainwright Bank & Trust ("Wainwright"), a local, publicly traded bank. Bray traded on the tip, and earned a profit of approximately $300,000, roughly double what he had invested. Bray was convicted on January 28, 2016, following a four-day jury trial at which O'Neill testified as a cooperating witness for the government.

O'Neill agreed to accept responsibility and plead guilty to his crime within weeks of his arrest in August 2014. Indeed, long before his arrest, O'Neill resigned his lucrative position as a

senior vice president of Eastern Bank ("Eastern")—the bank that acquired Wainwright—rather than lie in response to a routine inquiry by the Financial Industry Regulatory Authority ("FINRA") into suspicious trading in Wainwright's stock—a lie that may well have gone undetected, protecting his job and forestalling any further inquiry.  By any measure, O'Neill's cooperation with the government's investigation and resulting prosecution has been substantial.  His testimony at trial provided critical evidence concerning the circumstances under which he provided the tip at Bray's request, and the benefits that O'Neill expected to receive, and that Bray in fact offered him, in exchange.  For that reason, and the reasons set forth below, the government respectfully moves for a downward departure pursuant to Section 5K1.1, and recommends that the Court impose a sentence of probation for a term of one year.

I. Background

O'Neill's personal history and the background of his cooperation are recounted in detail in the Pre-Sentence Investigation Report ("PSR"), and in O'Neill's testimony at trial in United States v. Bray, 14-CR-10356-WGY (attached hereto as Exhibit A).  In brief, in June 2010, over drinks at the Oakley Country Club, in Watertown—where both O'Neill and Bray were longtime members—O'Neill tipped Bray that Wainwright was about to be acquired.  O'Neill and Bray had been friends for many years, and Bray, who was one of the most popular members at Oakley, had developed a particular fondness for O'Neill's son Matthew, with whom he shared a love of golf.  Over the years, Bray gave Matthew valuable gifts:  his first set of golf clubs, which Bray had cut down to Matthew's size, and, years later, a check for $1,000 upon his graduation from high school, which O'Neill ripped up because he thought it was too extravagant.  When Matthew, then an aspiring architect, was in college, Bray hired him to draw some renderings for

2

one of Bray's real-estate projects, and also arranged for him to get a summer internship with a local architect.

O'Neill knew about the Wainwright deal because he headed a team conducting due diligence on Wainwright for Eastern, where he had worked in a senior-executive capacity since January 2010. At the bar, Bray asked O'Neill for a tip and said he needed to make a "big score" because he was working on a real-estate project in Watertown. O'Neill wrote the name "Wainwright" on a bar napkin and passed it to Bray, telling him, in substance, "This could be a good one." Bray went on to acquire thousands of shares of Wainwright—a small and thinly traded bank—singlehandedly accounting for more than half of the total trading volume in the bank's shares over the next two weeks. When Eastern's acquisition of Wainwright was announced on June 29, 2010, Wainwright's stock spiked and Bray earned approximately $300,000—roughly doubling his investment. In the weeks after his "big score," Bray thanked O'Neill and offered him the opportunity to invest in Bray's Watertown development. O'Neill demurred.

In August 2010, FINRA began a routine inquiry into unusual trading ahead of the Wainwright deal. As part of its standard practice, it sent Eastern a letter listing the names of individuals, including Bray, who had traded in Wainwright's stock in advance of the merger. FINRA asked Eastern to circulate the letter to insiders at the bank who had advance knowledge of the Wainwright deal, and requested that those insiders review the list of names, identify anyone they knew, and indicate whether they had provided those individuals with material, nonpublic information about the deal.

When O'Neill received the list and saw Bray's name, he panicked. He drove to the country club and confronted Bray. Bray reassured O'Neill that he hadn't told anyone about the tip, and that if regulators ever asked him about it, he would tell them a story that would have them wishing they had bought the stock. He reiterated his offer to bring O'Neill in on the Watertown development, but O'Neill did not accept the offer and the project was, in any event, never built. O'Neill ultimately resigned from Eastern rather than respond to the FINRA inquiry. In so doing, he gave up a six-figure job that provided a lifetime pension. He was ultimately unemployed for approximately six months, before finding a lower-paying job at another bank. Following his arrest, O'Neill lost that job as well, and he is now, at age 66, unemployed and effectively unemployable in the banking industry.

II.  O'Neill's Acceptance of Responsibility and Guilty Plea

O'Neill was arrested on a complaint on August 18, 2014. Shortly thereafter, he met with prosecutors, admitted his own culpability, and agreed to cooperate with the government's investigation. Specifically, at his very first proffer, O'Neill candidly acknowledged having knowingly and intentionally provided a secret stock tip to Bray while the two men were sitting at the country club bar. He provided detailed information about the circumstances of the tip, including the long history the men had of chatting casually about bank stocks, Bray's request that night for a specific tip that would allow him to make a "big score," and O'Neill's decision to write the name "Wainwright" on a cocktail napkin and slide it across the bar. O'Neill acknowledged that, in providing the tip, he expected that Bray would use it to trade in Wainwright's stock. And he described, in detail, conversations that the two men had in the

4

weeks after the tip, including the conversation in which Bray suggested that he would seek to mislead regulators if they ever inquired about his trading.

Critically, O'Neill also candidly acknowledged what he expected to receive in return for providing the tip to Bray. Among other things, he described Bray's offer, within weeks of the tip, to bring O'Neill into the Watertown real-estate project, as well as Bray's reiteration of that offer in August 2010, when O'Neill confronted Bray about the FINRA inquiry. And he described the peculiar circumstances surrounding Bray's gift of $1,000 to Matthew O'Neill in June 2013, purportedly for the architectural renderings Matthew had prepared years earlier, and for which he had long since been paid.

Finally, O'Neill acknowledged, in that first proffer, his profound remorse for what he had done, and for the impact his actions had had on his family. Indeed, he noted that even on the very night he provided the tip to Bray, he knew that what he had done was terribly wrong.

Prior to O'Neill's proffer, the government had little insight into the nature and extent of O'Neill's relationship with Bray, the details of their interactions surrounding the stock tip, and the personal benefits that O'Neill expected to receive, and that Bray in fact offered him, in exchange for the tip.

O'Neill signed a plea and cooperation agreement with the U.S. Attorney's Office on October 30, 2014—little more than two months after his arrest and in the absence of any discovery from the government—and pleaded guilty before this Court on December 4, 2014.

III. Sentencing Guidelines

"The guidelines, though advisory, constitute a starting point for the fashioning of a sentence." United States v. Fernandez-Garay, 788 F.3d 1, 6 (1st Cir. 2015) (citation omitted).

The government agrees with the Probation Office's calculation of the Sentencing Guidelines in this case. The Base Offense Level for an insider-trading conviction is 8, pursuant to USSG §2B1.4(a), and 12 levels are added because Bray's gain, $300,000, was more than $250,000 but not more than $550,000. USSG §2B1.1(b)(1)(H). Notably, notwithstanding his expectation of receiving a personal benefit from Bray, as set forth above, O'Neill did not share in Bray's trading profits. O'Neill also qualifies for a 3-level reduction for timely acceptance of responsibility, pursuant to USSG § 3E1.1, resulting in a total adjusted offense level of 17. Based on his lack of a criminal history, O'Neill's advisory sentencing guidelines range is incarceration for a period of 24 to 30 months (prior to consideration of his cooperation or application of the factors set forth in 18 U.S.C. § 3553(a)).

## IV. O'Neill's Cooperation

O'Neill proffered twice prior to entering into a plea and cooperation agreement with the government. As set forth above, he was fully candid and forthcoming in those proffer sessions. He thereafter met with the government on multiple occasions to prepare for trial, and testified at Bray's trial over the course of two days in January 2016.

As noted, O'Neill's testimony was a critical factor in securing Bray's conviction. At trial, the government introduced documentary and other evidence proving, among other things, that: (1) O'Neill had access to material non-public information concerning the sale of Wainwright as of May 2010, and was under a duty to Eastern not to disclose it to anyone who might trade on it; (2) O'Neill and Bray were together at the bar at the Oakley Country Club on or about June 6 and 13, 2010; (3) Bray began investing heavily in Wainwright's stock on June 14, 2010 and for the two weeks thereafter leading up to the announcement of Eastern's acquisition of

Wainwright on June 29, 2010; and (4) Bray served as a job reference for O'Neill's son in the summer of 2010, and gave him $1,000 in cash in the summer of 2013.  Yet it was O'Neill's testimony that provided a detailed narrative concerning, among other things: (1) the nature and history of his friendship with Bray; (2) what actually transpired at the country club bar, including Bray's unprecedented request for a tip that would allow him to achieve a "big score," because he needed money for the second phase of his Watertown construction project; (3) how O'Neill expected to benefit from providing the tip to Bray; (4) the real-estate investment opportunity Bray twice offered O'Neill in gratitude for the tip; and (5) how Bray reacted to the news of a regulatory inquiry into his trading, including his promise to mislead regulators about his trading by telling them a story that would leave them wishing they had purchased the shares themselves. O'Neill was thus able to provide unique insight into the knowledge and intent of the conspirators concerning the wrongfulness of their actions—devastating evidence that, without his cooperation, the government would have been unable to secure.

O'Neill's testimony was highly credible and was corroborated by other, independent evidence of which, the government believes, O'Neill was unaware.  As just one example: O'Neill testified that Bray told him he needed money to complete the second phase of a Watertown real-estate development, and that O'Neill's understanding was that the development involved the construction of an extended-stay hotel.  The government introduced evidence at trial, in the form of documents and the testimony of a Watertown building inspector, that:  Bray was indeed working on a building project in Watertown in the spring and summer of 2010; during the construction of an apartment building, Bray damaged a nearby building, resulting in his acquisition of that building from its owner and his subsequent demolition of the building;

Bray intended to build a second phase of his project on the site of the demolished building; and Bray at one time contemplated that the second phase would consist of an extended-stay hotel. Accordingly, O'Neill's testimony was likely an important piece of evidence in the jury's ultimate decision to convict Bray of securities fraud.

V. Section 3553(a) Factors

   A. The Nature and Circumstances of the Offense

Insider trading is a serious crime. The stock market functions properly only when participants follow the various rules established to promote efficiency, transparency, and fairness. When market participants break those rules, the market's integrity is undermined.

Nor is insider trading a victimless crime. The market is composed of people and institutions. Other investors sold Bray shares of Wainwright at $9 per share because they did not know what O'Neill told him—that that the stock was about to skyrocket. In short, Bray, with O'Neill's help, had an unfair advantage over other participants in the market. This type of cheating has real financial consequences for investors on the other side of the trade; it can, in certain circumstances, potentially even disrupt the types of mergers and other financial transactions from which those who engage in it often profit. More broadly, insider trading corrodes the very operation of the financial markets. It saps confidence in the system and, left unchecked, could cause investors to pull out of the markets altogether.

O'Neill's actions are all the more serious because of his position as a senior executive at a financial institution. Individuals in such positions have a heightened responsibility—for which they are typically well compensated—not to use their positions to benefit themselves, or their families and friends, at the expense of their employers, clients, and business partners. O'Neill,

by virtue of his extensive training and long career in financial services, was intimately familiar with these obligations, and yet chose to betray them. Such choices, particularly by individuals with heightened moral and legal duties, must have consequences.

      B.   The History and Characteristics of the Defendant

The defendant's personal history is set forth in the PSR. Three items bear particular note. First, the defendant's involvement in the instant crime was, quite literally, a momentary aberration in an otherwise unimpeachable life. Previously, O'Neill had a long and distinguished career in commercial banking that culminated—just five months before his meeting in the bar with Bray—in his appointment as a senior vice president of Eastern. His decision to pass Bray a napkin containing an illegal stock tip—while knowing, voluntary, willful and criminal—happened in an instant. Unlike Bray—who proceeded to trade on the information on multiple occasions over the course of the ensuing two weeks, deciding each time anew to commit a crime—O'Neill's crime was completed the moment he passed the tip. While he did not, thereafter, take steps to prevent Bray from trading on the tip (or even request that he not do so), neither did he take any additional steps to further the crime. When Bray later offered him an opportunity to profit from the crime by participating in Bray's real-estate development, O'Neill demurred. And unlike Bray—who lied to securities regulators when confronted with his actions—O'Neill resigned his job rather than lie about what he had done.

Second, O'Neill is deeply remorseful about his conduct. Indeed, as O'Neill made clear in his first, tearful proffer, he regretted his actions virtually from the moment they occurred. He told the government in that first meeting that he went home from the bar knowing he had done something wrong and had a conversation with his wife. And he has continued to express sincere

and profound contrition since that day, not just for what he did, but also for the consequences his actions have had on his wife and his children, on his career, and on his reputation in the community. █████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████

████████████████ In short, O'Neill's remorse is genuine, deep and meaningful. Moreover, that remorse does not simply date from his arrest, and is not simply about getting caught. Rather, it was concomitant with his crime, and appears to stem from his recognition that he betrayed not just his employer and the other parties affected by his crime, but also his own principles and moral compass.

Third, and relatedly, any consideration of the history and characteristics of the defendant would be incomplete without some acknowledgement of the values that have otherwise guided his life. These are perhaps most readily evident in the way he has raised his children. The Court has direct evidence of this from the testimony of O'Neill's middle child, Matthew, in the Bray trial (attached hereto as Exhibit B). A recent college graduate, Matthew O'Neill is currently employed by a not-for-profit microfinance foundation that lends money to women who live below the poverty line. See Exhibit B at 31:15-19. Previously, he served for 27 months as a volunteer for the United States Peace Corps in Ghana, where, as the PSR notes, he worked at a

health clinic that assisted people living with HIV.  Id. at 31:22 – 32:4; PSR ¶ 63.  Notwithstanding the circumstances of his testimony—including the fact that both he and his father were testifying as witnesses for the government, against a man for whom both felt great affection—Matthew O'Neill testified forthrightly and candidly, in response to questions posed by both the government and the defense, about his own relationship with Bray, which dates from Matthew's childhood.  Among other things, for example, he described Bray as "generous" (id. at 33:23; 48:6-8), and noted that he was "grateful" to Bray for kindnesses Bray had shown him and gifts Bray had given him over the years (id. at 43:5-17).  The straightforward, unvarnished manner in which Matthew O'Neill testified, under difficult circumstances, and the commitment to public service he has displayed, serve as compelling proof of the values by which he lives. As much as these values speak to the character of the son, they speak equally to the character of the parents who raised him.

    C.  The Need for Just Punishment, Adequate Deterrence
         And to Protect the Public from Further Crimes of the Defendant

In contrast to Bray—who has, to date, suffered no discernible consequences from his actions, save to profit by $300,000—O'Neill has suffered manifold financial and other consequences for nearly six years.  In September 2010, he resigned from Eastern rather than attempt to save his job by lying in response to the FINRA inquiry concerning Bray's trading.  In so doing, he not only gave up a lucrative position that paid him nearly $200,000 per year, but also a defined-benefit pension plan that promised to provide a comfortable income throughout his retirement.  For six months, O'Neill was unemployed.  He thereafter obtained a lower-paying job at another bank, which he lost following his arrest in 2014.  He has remained unemployed since that time.  At age 66, with a criminal conviction for conspiracy to commit securities fraud

on his record, O'Neill's career is effectively over. After a life in banking, he has left that profession in disgrace, and even if he is able to find some employment, he is unlikely ever to earn more than a fraction of his former income.

Having earned nothing from his crime, O'Neill has been devastated financially. While he maintains considerable savings and equity in the home in which he has lived for nearly a quarter century, he also faces considerable short- and long-term debts, including credit-card and student-loan debts exceeding $321,000. See PSR ¶¶ 87-93. His mortgage and other living expenses exceed his income by an estimated $1,400 per month. Id. ¶¶ 96-97.

In light of these consequences, the defendant is not likely ever again to be in a position to obtain inside information and pass it to others. Nor, as the foregoing suggests, is he likely to do so. There is, accordingly, little need for a term of incarceration either to promote the interests of specific deterrence, or to protect the public from further crimes of the defendant. That said, the government respectfully submits that the goals of general deterrence and just punishment do counsel in favor of a sanction that serves as a warning to others, who may be similarly situated, that corporate insiders who improperly use their access to material nonpublic information to benefit themselves, or their family and friends, will face serious punishment if they are caught.

VI. Conclusion

O'Neill is now 66 years old and stands convicted of a serious crime. At the same time, O'Neill's cooperation provided substantial assistance to the government's investigation and prosecution of his co-conspirator, Robert Bray. Insider trading—which as often as not occurs over drinks at a bar, or in whispered conversations on a golf course—is difficult to detect. If it is

to be stopped, it will be, in part, because of cooperating witnesses like the defendant, who are able to lift the veil of secrecy under which such frauds are invariably cloaked.

There are, therefore, important policy implications to O'Neill's sentence. Despite his own criminal conduct, cooperators like O'Neill are necessary to ensure that criminal activity like that in which he and Bray engaged is uncovered and prosecuted, and that securities markets and securities investors are protected from the types of cheating this case laid bare. Without cooperators like O'Neill, those responsible for such frauds all too often go uncharged, and unpunished. Such cooperation must be recognized in imposing sentence.

O'Neill's personal characteristics, his obvious remorse, and the profound repercussions his actions have had on his life and that of his family, also counsel in favor of leniency. For all these reasons, the government submits that a sentence of probation for a term of one year is sufficient, but not greater than necessary, to provide just punishment and adequate deterrence, and otherwise to achieve the goals of sentencing.

                Respectfully submitted,

                CARMEN M. ORTIZ
                United States Attorney

        By: */s/ Stephen E. Frank*
              STEPHEN E. FRANK
              ERIC P. CHRISTOFFERSON
              Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

       I hereby certify that this document file through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: May 5, 2016

                                */s/ Stephen E. Frank*
                                Stephen E. Frank