# EXHIBIT A

```
 1          P R O C E E D I N G S
 2          (EXCERPT begins.)
 3          THE COURT:  Call your first witness.
 4          MR. FRANK:  Thank you, your Honor.  The government
 5    calls John Patrick O'Neill.
 6          THE COURT:  He may be called.
 7          (JOHN PATRICK O'NEILL, sworn.)
 8
 9          * * * * * * * * * * * * * * * * * * * *
10          JOHN PATRICK O'NEILL
11          * * * * * * * * * * * * * * * * * * * *
12
13    DIRECT EXAMINATION BY MR. FRANK:
14    Q.    Good morning, sir.
15    A.    Good morning.
16    Q.    Would you please state and spell your name for the
17    Court Reporter, please.
18    A.    My name is John Patrick O'Neill.  It's J-O-H-N,
19    P-A-T-R-I-C-K, O apostrophe N-E-I-L-L.
20    Q.    Now, do you have a nickname, sir?
21    A.    "Pat."
22    Q.    Thank you.  How old are you?
23    A.    I'm 66 years old.
24    Q.    Where do you live?
25    A.    I live in --
```

1          THE COURT:  Well, city and town is enough.

2     A.    Um, Belmont, Massachusetts.

3     Q.    Are you currently employed?

4     A.    I am not.

5     Q.    When was the last time that you were employed?

6     A.    Um, August of 2014.

7     Q.    And just tell us generally what did you do for a

8     living?

9     A.    Um, I was a banker most of my career.

10    Q.    What happened in August of 2014?

11    A.    I got arrested.

12    Q.    For what?

13    A.    Inside trading.

14    Q.    And did there come a time when you were actually

15    convicted of a crime?

16    A.    There did.

17    Q.    When was that?

18    A.    That was December of 2014.

19    Q.    What crime were you convicted of?

20    A.    Conspiracy to commit securities fraud.

21    Q.    What did you do that led to your conviction of

22    conspiracy to commit securities fraud?

23    A.    I gave an insider tip.

24    Q.    And when was that?

25    A.    That was in June of 2010.

1    Q.    And who was it that you tipped?

2    A.    Mr. Robert Bray.

3    Q.    I'd ask you, sir, to look around the courtroom, if

4    I may, and ask whether you would see the individual that

5    you tipped, Robert Bray, in the courtroom today?

6    A.    I do.

7    Q.    Would you please identify him by where he's

8    sitting and what he's wearing?

9    A.    Um, he's sitting over to my left and he has a, um,

10   it looks to be a bluish-type suit, a necktie and shirt

11   and glasses.

12         MR. FRANK:  May the record reflect that the

13   witness has identified the defendant?

14         THE COURT:  It may.

15         MR. FRANK:  Thank you.

16   Q.    Sir, how do you know Robert Bray?

17   A.    I know him through Oakley Country Club.

18   Q.    And where is Oakley Country Club?

19   A.    It's in Watertown, Massachusetts.

20   Q.    Are you a member of that club?

21   A.    I am.

22   Q.    Do you know if the defendant is a member of that

23   club?

24   A.    He is.

25   Q.    As of June of 2010, can you estimate how long you

1    had known the defendant?

2    A.    Um, approximately 15 years.

3    Q.    What was the nature of your relationship with him?

4    A.    It was mainly social.

5    Q.    Sir, do you know if the defendant traded based on

6    the inside information you say you provided him?

7    A.    He did.

8    Q.    How do you know that?

9    A.    He told me so.

10   Q.    And we'll return to that in a minute, but I would

11   like to take a step back for just a moment.

12   Would you tell the jury how far you went in school?

13   A.    I have a master's in business administration from

14   the University of Massachusetts in Amherst.

15   Q.    After you received your MBA -- when was that?

16   A.    That was in 1976.

17   Q.    After you received your MBA in 1976, what kind of

18   job did you get?

19   A.    I started my career in public accounting and then

20   I went into banking.

21   Q.    And when was it that you got into banking,

22   roughly?

23   A.    1981.

24   Q.    And over the course of your career since 1981, did

25   you work at one bank in particular or did you work at

1    more than one bank?

2    A.    No, I worked at several banks.

3    Q.    What were some of the banks that you worked at?

4    A.    Well, I started at Bank of New England, which was

5    ultimately taken over by Fleet Bank, which was

6    ultimately taken over by Bank of America.  I was there

7    for a while.  Then I went over to Citizen's Bank for

8    about 8 years.  Then I join Lehman Brothers for two

9    years, but they failed.  After which I joined Eastern

10   Bank.

11   Q.    In general, what kind of jobs did you have at

12   those banks?

13   A.    Primarily credit-oriented jobs.

14   Q.    What does that mean?

15   A.    "Credit" is the review of or an approval of a

16   loan, um, commercial loans primarily.

17   Q.    At any time did you work in mergers and

18   acquisitions?

19   A.    I did.

20   Q.    What did you do with respect to mergers and

21   acquisitions?

22   A.    Well, I worked on many mergers and acquisitions

23   and I would typically head up a due diligence project or

24   a due diligence team.

25   Q.    Just by way of background, in the banking industry

1  where you work, what does a "merger" or an "acquisition"
2  mean?
3  A.    It's when two banks want to combine or be bought
4  out by one another.
5  Q.    And you mentioned something called "due
6  diligence," what's that?
7  A.    That's the process whereby a team will go in and
8  review the books of a bank about to be required -- to be
9  "acquired."  I'm sorry.
10  Q.    And what are you looking for?
11  A.    Well, you're just looking for, you know, anomalies
12  in a portfolio, any IRS credits, and then you want to
13  ensure that the portfolio is a sound one before you
14  purchase it.
15  Q.    I'd like to direct your attention to January of
16  2010.  What happened in that month?
17  A.    In January of 2010, that's when I first started
18  working for Eastern Bank.
19  Q.    You took a job at Eastern Bank?
20  A.    Yes.
21  Q.    And what is that bank?
22  A.    Eastern Bank?
23  Q.    Yes.  What is it?
24  A.    Oh, I'm sorry.  It's a -- at that time it was
25  about an $8 billion mutual bank based here in Boston,

1    Massachusetts.

2    Q.    And when you say "$8 billion," what are you

3    referring to?

4    A.    Um, the asset size.

5    Q.    Okay.  And you said it was a "mutual bank"?

6    A.    It was a "mutual bank," yes.

7    Q.    What does that mean?

8    A.    It's one that's owned by its depositors.

9    Q.    So it wasn't publicly traded?

10   A.    It was not publicly traded.

11   Q.    What was your job at the bank?

12   A.    I was a senior credit officer.

13   Q.    And what were the responsibilities of a senior

14   credit officer?

15   A.    Um, I would approve commercial loans or disapprove

16   commercial loans and I was a co-chair of the loan

17   approval committee.

18   Q.    In that role did you have access to confidential

19   information?

20   A.    I did.

21   Q.    And speaking generally, what kinds of confidential

22   information did you have access to on a daily basis?

23   A.    Well, all of the books and records of whatever

24   loans that -- you know, a bank may have on their books,

25   personal financial statements, corporate financial

 1   statements, other related data and memos.

 2        MR. FRANK:  If we could call up for the witness

 3   what's been marked as Exhibit 7.

 4        (On screen.)

 5   Q.   Mr. O'Neill, you're going to see a document come

 6   up on your monitor.

 7        MR. FRANK:  And just for the witness, not for the

 8   jurors, yet.

 9        (On screen.)

10        MR. FRANK:  It's showing up on the jury monitors.

11        (Takes off jury's screen.)

12        MR. FRANK:  There we go.

13   A.   Yes.

14   Q.   Sir, do you recognize this document?

15   A.   I do.

16   Q.   What is it?

17   A.   It's the Eastern Bank code of conduct.

18        MR. FRANK:  The government offers Exhibit 7.

19        THE COURT:  No objection?

20        MR. MONAHAN:  No objection.

21        THE COURT:  Okay.  Now, have you gotten together

22   here, shall I use these numbers or shall we now impose

23   numbers?

24        MR. FRANK:  We have gotten together, your Honor,

25   and --

1          THE COURT:  Oh, and you have, and I have it here.

2     Thank you very much.  All right.  So let's see if we can

3     save some time here.

4          So looking at this chart here, these 25 exhibits

5     are all agreed that the jury may see, correct?

6          MR. MONAHAN:  Yes, your Honor.

7          THE COURT:  And so we can save time, you may just

8     treat them that they are in evidence.  And that's what I

9     had in mind by interrupting.  They've gotten together

10    before we started and at least 25 different documents

11    they all agree you can see them.  Now that doesn't mean

12    they agree that they're all accurate and the like,

13    that's for you to decide.  But they all agree you can

14    see them.  This one is Number 7.

15         And go ahead, Mr. Frank.

16         MR. FRANK:  Thank you, your Honor.

17    Q.    Sir, what is the "code of conduct"?

18    A.    It basically is a guideline by which employees are

19    governed.

20    Q.    And I'd like to direct your attention to Page 2 of

21    that document.  (On screen.)  There we go.

22         MR. FRANK:  And if we could just highlight the

23    section marked "Confidential Information" and blow that

24    up.

25         (Enlarges on screen.)

1          MR. FRANK:  I'd just like to read that into the

2     record, if I might, your Honor?

3          THE COURT:  You may.

4     Q.   Under Section 2, "Confidential Information," it

5     says:  "Safeguarding the confidential nature of

6     information concerning any of Eastern Bank's

7     transactions, its present, former, and prospective

8     customers as well as its suppliers, is essential to the

9     conduct of its business.  Caution and discretion are

10    required in the use and sharing of such information."

11         MR. FRANK:  And if I could just jump down to the

12    third paragraph.

13         (On screen.)

14    Q.   It says:  "Confidential information must not be

15    used to further any private interests or for personal

16    gain nor shall it be divulged to any unauthorized

17    person, business, corporation, or other entity either

18    during an employee's employment with Eastern Bank or

19    after the termination thereof without first obtaining

20    the express written consent of Eastern Bank."

21    Q.   Do you recall you read that when you joined

22    Eastern Bank?

23    A.   I did.

24    Q.   Did you understand it?

25    A.   I did.

1    Q.    I'd like to now direct your attention to Page 9.

2    A.    Okay.

3    Q.    And there's a section there labeled "Investments."

4          MR. FRANK:  And if we could just highlight and

5    enlarge the second paragraph.

6          (Highlights.)

7    Q.    It says:  "It is also important that all

8    investments made by employees and those representing the

9    bank comply with federal securities laws and

10   regulations.  Individuals are prohibited from buying or

11   selling any security or recommending such sale or

12   purchase for the account of a customer, for the

13   investment portfolio of the bank or any of its

14   affiliates, or for the individual's personal account or

15   that of others, while in possession of any inside

16   information about the issuer of any security or the

17   securities themselves regardless of whether the inside

18   information is gained through your employment or

19   elsewhere.  To do so is in violation of federal

20   securities laws and may subject the individual to severe

21   legal penalties."

22         Did I read that accurately?

23   A.    You did.

24   Q.    Did you understand it?

25   A.    I did.

1    Q.    If I could now --

2          MR. FRANK:  We can -- we don't need that exhibit

3    anymore.

4    Q.    If I could now direct your attention to May of

5    2010.  Would you tell us what happened in May of 2010?

6    A.    That's when I was approached and asked to take

7    part in the due diligence of Wainwright bank.

8    Q.    And who asked you to do that?

9    A.    Um, my boss, Daniel Sullivan.

10   Q.    And can you tell us, what was Wainwright bank?

11   A.    Wainwright was a relatively small, 1 billion

12   dollar-sized bank, right here in Boston.

13   Q.    And, um, was it a mutual bank also?

14   A.    No, it was a public bank.

15   Q.    And what does that mean?

16   A.    It means their stock traded on an exchange.

17   Q.    And, um, roughly how long did the due diligence

18   process take?

19   A.    It could take three or four weeks, sometimes more.

20   Q.    Okay.  Um, I'm going to show you Exhibit 5.

21         MR. FRANK:  Pull that up.

22         (On screen.)

23   Q.    Do you recognize this document?

24   A.    Yes.

25   Q.    What is it?

1   A.    A confidentiality statement.

2   Q.    And if I could just read from the top.

3         "I hereby acknowledge that I have been advised by

4   the management of Eastern Bank Corporation of a possible

5   transaction involving Wainwright Bank and Trust Company,

6   the transaction could result in a possible acquisition

7   of the company by Eastern.  In addition, it is likely

8   that I will receive specific information about the

9   company during the due diligence process -- during the

10  due diligence conducted by Eastern.  This information is

11  confidential and nonpublic, it constitutes insider

12  information under applicable securities laws and

13  regulations."

14        And then it says "Accordingly I agree I must

15  avoid"  -- and there's a series of four bullet points.

16  If I could just direct you to the second and the third

17  bullet points.  It says:  "You must avoid disclosing

18  material, nonpublic information about the company to any

19  other person, including family members, friends, or

20  colleagues, where the information may be used by the

21  other person to profit by trading in the company's

22  securities or be otherwise in violation of

23  confidentiality agreements entered into by Eastern and

24  the company."  And then the third bullet says:

25  "Recommending or suggesting that anyone else buy, sell,

1   or retain the stock or other securities of the company

2   while I have material nonpublic information about the

3   company or are aware of a possible transaction involving

4   the company."

5        Did you read that at the time it was given to you?

6   A.    I did.

7   Q.    Did you understand it?

8   A.    I did.

9   Q.    And is that your signature at the bottom of the

10  page?

11  A.    It is.

12  Q.    Okay.  And it says "senior vice-president"?

13  A.    That's correct.

14  Q.    Okay.  And, um, just by way of sort of orienting

15  us, was that -- where did that title rank in the bank?

16  A.    I was a senior executive within the bank.

17  Q.    And what is the date?

18  A.    Dated May 20th, 2010.

19  Q.    At the time you signed this agreement, what was

20  your understanding, if any, about whether Wainwright was

21  likely to be sold to another bank?

22  A.    Well, my understanding was that Eastern Bank was

23  certainly interested in buying Wainwright Bank,

24  providing the due diligence bore that out.  But there

25  were several other banks also looking at Eastern Bank

1    too.

2    Q.     Looking at --

3    A.     Oh, I'm sorry, at Wainwright Bank.

4    Q.     Okay, and so just -- you've testified that Eastern

5    was interested.  But what was your understanding, if at

6    all, about whether Wainwright was likely to be sold so

7    some other bank?

8    A.     Well, it was fairly definite.  They wanted to be

9    sold.

10   Q.     What if anything did you know about whether that

11   information, that Wainwright wanted to be sold, was

12   publicly available?

13   A.     It was not.

14   Q.     Do you know if it had been reported anywhere in

15   any newspaper or radio or television?

16   A.     It had not.

17   Q.     Did you in fact keep the information you had about

18   Wainwright confidential?

19   A.     I did not.

20   Q.     What did you do?

21   A.     I told Mr. Bray.

22   Q.     And when was that?

23   A.     That was in June of 2010.

24   Q.     And where was it?

25   A.     It was at Oakley Country Club upstairs in the pub.

1    Q.    You testified that you'd known Mr. Bray or at this

2    point you had known him for what, about 15 years?

3    A.    That's correct.

4    Q.    How did you meet him?

5    A.    Oh, I met him through Oakley Country Club.

6    Q.    What role did Oakley Country Club play in your

7    family's social life over the 15 years you can remember

8    at that point?

9    A.    It actually played quite a bit into our social

10   life, I have three children and they all grew up at

11   Oakley Country Club.  Oakley offered swimming, tennis,

12   and golf for the children, which they all took part in

13   as they were growing up, and my wife and I spent a fair

14   amount of time up there socializing, a lot of our

15   friends are up there.

16   Q.    And when you spent time at the club, um, over that

17   15-year period, roughly how often would you say you saw

18   the defendant there?

19   A.    Um, probably once or twice a week.

20   Q.    And were there particular spots in the club that

21   you would generally see him?

22   A.    Usually upstairs in the pub, but sometimes in the

23   grill room.

24   Q.    Again, what was the nature of your relationship

25   with him?

1    A.    It was mainly social.

2    Q.    Did you socialize outside of Oakley?

3    A.    On an occasion.

4    Q.    Did you travel together?

5    A.    Um, no, not really.

6    Q.    What did you call the defendant?

7    A.    He had a nickname, "Bubba."

8    Q.    Did you play golf together?

9    A.    Um, we did, maybe five, six, seven, eight times.

10   Q.    Over 15 years?

11   A.    Um, yes.

12   Q.    Why didn't you play golf more often?

13   A.    Well, Mr. Bray was a much better golfer than I was

14   and typically golf is played within their own handicap

15   range.

16   Q.    So who did you play golf with?

17   A.    I played golf with a group of fellows primarily

18   that were high handicappers, 18 to 25 range.

19   Q.    Did that group have a name?

20   A.    They do, it's called a "CSE group."

21   Q.    Does that stand for something?

22   A.    Am I allowed to say that in the courtroom?

23         MR. FRANK:  Um, Judge, there's a somewhat, um --

24   it stands for a somewhat "blue" term.

25         THE COURT:  We live in the real world here.  It's

1    your case to try.  If you think it's germane and I hear

2    no objection, then I think the jurors are capable of

3    living in the real world.  But it's your case to try.

4          MR. FRANK:  Thank you, your Honor.

5    Q.    What was the name of the group?

6    A.    It's the "CSE group," which means "Can't Suck

7    Enough."

8    Q.    And that's who you played golf with?

9    A.    That's who I played golf with typically.  I played

10   with a lot of other people at the club also.

11   Q.    Now, when you saw -- so you saw Mr. Bray mostly

12   then, you said, in the pub room?

13   A.    Oh, yes.

14   Q.    When you saw him there, um, typically were you

15   alone with him or were you with others?

16   A.    Um, usually with others, but we had been alone

17   together there as well.

18   Q.    What were you doing there?

19   A.    Usually just socializing, drinking beer, watching

20   sports.

21   Q.    And in that time that you spent with him, did you

22   have an opportunity to observe his interactions with

23   other people at the club?

24   A.    I did.

25   Q.    What were you able to observe?

```
1    A.    Well, he was very well liked, everyone would talk
2    to Bubba.
3    Q.    Do you know what he does for a living?
4    A.    Um, he was a contractor and a real estate
5    developer.
6    Q.    How do you know that?
7    A.    He had told me so, and he had done some work at my
8    house.
9    Q.    What kind of work did he do at your house?
10   A.    He had one of his, um, subcontractors renovate our
11   basement and then later on he had some other
12   subcontractors replace the roof on our house.
13   Q.    And were you happy with that work?
14   A.    Generally.
15   Q.    Do you know if the defendant knows what you do for
16   a living or did for a living?
17   A.    I believe he does.
18   Q.    How does he know that?
19         MR. MONAHAN:  Objection.
20         THE COURT:  Yeah, I'm going to sustain it on
21   what's going on in his mind, on that foundation.
22   Mr. Bray's mind.
23   Q.    Do you have an understanding of, um, how he would
24   know what you did for a living?
25         MR. MONAHAN:  Objection.
```

1        THE COURT:  Well, I'm going to sustain that.

2    Let's go to interactions that this witness actually

3    knows and we'll see what he -- what this witness has to

4    say.

5    Q.    When you were with, um, Mr. Bray, what kinds of

6    things did you talk about?

7    A.    Well, we talked about sports, um, he would

8    occasionally ask how my family was doing, how my

9    children were doing.  We'd talk about stocks on

10   occasion.  You know, different things.

11   Q.    Did you talk about what you each did for a living?

12   A.    Um, I believe I did, yes.

13   Q.    Now, you said you talked about family, I believe?

14   A.    Right.

15   Q.    Does the defendant know other members of your

16   family?

17   A.    He does.

18   Q.    What's the nature of his relationship with them?

19   A.    Well, I have my wife, Sharon, obviously, um, my

20   three children, Shawn and Matthew and Cara, and he took

21   a liking to the kids, um, as he does with most children,

22   and he in particular liked my son Matthew because

23   Matthew was a golfer and Bob Bray really liked kids who

24   took up the game of golf.

25   Q.    Now, in this period before June of 2010, were you

1  aware of whether Mr. Bray ever gave any gifts to members

2  of your family?

3  A.      Um, he had.

4  Q.      Tell us about that.

5          MR. MONAHAN:   Objection.

6          THE COURT:   No, overruled.   He may tell us what

7  gifts he gave to members of his family.   To your

8  knowledge.

9  A.      Um, at one point he took a set of golf clubs, I

10 believe they were his own, and he had them cut down and

11 he gave them to my son Matthew and when Matthew was

12 about 9 or 10, just beginning to take up the game of

13 golf, and he also gave Matthew a $1,000 check at his

14 high school graduation, which I subsequently ripped up.

15 Q.      Why did you do that?

16 A.      I thought the amount was exorbitant.

17 Q.      And again in this period prior to June of 2010,

18 did there come a time when Matthew ever worked for the

19 defendant?

20 A.      Well, Mr. Bray got him an internship working for

21 his architect.

22 Q.      And when was that?

23 A.      I believe that was 2009, the summer of 2009.

24 Q.      And what was Matthew doing in 2009?

25 A.      He was a freshman at Northeastern University in

1    their architectural program.

2    Q.    Do you know if Matthew ever did any work directly

3    for Mr. Bray?

4    A.    Um, he did.

5    Q.    What was that?

6    A.    He did several renditions or several drawings of a

7    condominium complex, um, it was really two buildings

8    that Mr. Bray was building.

9    Q.    And prior to 2010, June of 2010 in particular, did

10   you have an understanding of whether the defendant

11   invested in anything besides real estate?

12   A.    I know he invested in stocks.

13   Q.    How do you know that?

14   A.    Because he had told me so.

15   Q.    And, um, I believe you testified you talked about

16   stocks?

17   A.    We did from time to time.

18   Q.    What did you talk about?

19   A.    Well, he would ask me typically what bank stocks I

20   liked.

21   Q.    Bank stocks specifically?

22   A.    Usually it was bank stocks, yes.

23   Q.    And, um, what was your understanding of his

24   interest in bank stocks?

25   A.    Well, I knew he had a portfolio of some bank

1    stocks, I believe it was Bank of America and Genworth,

2    to name a few, and he was interested always in looking

3    at opportunities to buy additional stocks.

4    Q.    And so what did you tell him -- again before June

5    of 2010, what did you tell him about bank stocks when he

6    asked you?

7    A.    I would usually tell him, "Bob, as I've talked to

8    you in the past, you know the bank stocks I typically

9    like or recommend are usually small community banks like

10   Belmont Savings, Brookline Savings, Cambridge Savings,

11   um, Boston Private Bank & Trust," you know I thought

12   they were all likely merger candidates or banks that

13   could be taken over by other banks.

14   Q.    Are all those banks publicly traded or were they

15   at the time?

16   A.    Um, at the time I'm pretty sure Boston Private was

17   publicly traded.  Um, Brookline Savings I believe went

18   public after June of 2010.  And certainly Belmont

19   Savings Bank.

20   Q.    Do you know if there's a way to invest in a bank

21   that is not public but is likely to go public?

22   A.    Well, you can put deposits in there, in your name,

23   and you'd likely get a benefit on the stock at a reduced

24   price below market value if they go public.

25   Q.    Okay.  So now I want to direct your attention to

1    June of 2010.

2        You testified that in that month you provided

3    information to the defendant about Wainwright?

4    A.    I did.

5    Q.    Where were you when that happened?

6    A.    We were in the pub at Oakley Country Club.

7    Q.    What were you doing in the pub?

8    A.    We were drinking and socializing.

9    Q.    Do you recall what day of the week it was?

10   A.    It was a Sunday.

11   Q.    Do you recall the exact date?

12   A.    It was either the 6th or the 13th of June.

13   Q.    What makes you so sure it was a Sunday?

14   A.    Because during that time frame the due diligence

15   was going on -- and Wainwright Bank was a self-conscious

16   bank or a good-conscience bank and they didn't want

17   people working on Sunday afternoons or Sundays for that

18   matter at all, and so we did not conduct due diligence

19   on any of the Sundays during the due diligence period.

20   Q.    I want to show you what we've marked as Exhibit 9.

21   (On screen.)  And this is a multi-page document and it

22   might actually be helpful if I could give you a hardcopy

23   of the document.  (Hands to witness.)

24        And if you could just flip through it and tell us

25   what that multi-page document is?

1    A.    (Looks.)   These are Oakley chits.

2    Q.    "Chits"?

3    A.    Yes.

4    Q.    What is a "chit"?

5    A.    A "chit" is an itemization of what you had to

6    drink or eat that day on any given particular day.

7    Q.    Like a bar tab?

8    A.    It's -- yes, the same thing.

9    Q.    Sir, do you have a favorite drink when you're at

10   the pub?

11   A.    I usually drink light beer, Miller Light or Coors

12   Light.

13   Q.    Do you know what the defendant drinks typically?

14   A.    Typically Mich Ultra.

15   Q.    Michelob Ultra?

16   A.    Right.

17   Q.    So if you'd take a look at the first chit, you'll

18   see at top it has a name.

19   Do you see that?

20   A.    I do.

21   Q.    And that's the defendant's name?

22   A.    I'm sorry?

23   Q.    The defendant's name, do you recognize that?

24   A.    Yes.

25   Q.    And then below that there's a date of June 6th,

```
 1    '10?
 2    A.    Right.
 3    Q.    And a time?
 4    A.    That's correct.
 5    Q.    Do you see that?
 6    A.    Yes.
 7    Q.    Okay.  And would you flip to the next one.
 8    A.    (Turns.)
 9    Q.    Do you see your name at the top there?
10    A.    I do.
11    Q.    And this is also on June 6th of 2010?
12    A.    That's correct.
13    Q.    And do you see the time?
14    A.    I do.
15    Q.    What time is it?
16    A.    6:29.
17    Q.    P.m.?
18    A.    P.m., yes.
19    Q.    Now, again do you recall what day of the week June
20    6th was?
21    A.    That was a Sunday.
22    Q.    Okay.  Do you know if you were playing golf on
23    that day?
24    A.    I believe I did play on June 6th.
25    Q.    And then I direct your attention to the next tab.
```

1    That's also from that same date and that's also for you?

2    A.    Um, yes.

3    Q.    And, um, is this a different tab from that day?

4    A.    Um, this is from the, um -- no, I'm sorry, it's

5    from the pub.

6    Q.    Okay.

7    A.    It's chicken wings.

8    Q.    Now, if we can take a quick look at the next one.

9    What's the date on that one?

10   A.    It's June 11th, Mr. Bray.

11   Q.    Okay.  And the next one?

12   A.    June 11th, my chit.

13   Q.    Okay.  And the next one?

14   A.    Another one, June 11th, my chit.

15   Q.    And is this -- what room is this one from?

16   A.    This is from the grill room, which is downstairs

17   from the pub.

18   Q.    Okay.  And the next one?

19   A.    This is June 13th to Mr. Bray.

20   Q.    Okay.  And this one is time-stamped what time?

21   A.    6:45 p.m.

22   Q.    And the next one?

23   A.    It's June 13th for Mr. Bray, time-stamped

24   8:43 p.m.

25   Q.    And the next one?

1   A.    Um, again on the 13th for Mr. Bray, time-stamped

2   5:11 p.m.

3   Q.    And the last one?

4   A.    It's my chit on June 13th with a time-stamp of

5   7:06 p.m.

6   Q.    Okay.  Thank you.

7   So we've looked at chits of you and Mr. Bray from three

8   different days, June 6th, June 11th, and June 13th.

9   And what day of the week was June 13th?

10  A.    It was a Sunday as well.

11  Q.    And were you off on that day?

12  A.    Yes.

13  Q.    And how do you know that?

14  A.    Well, that was the weekend of the Fred Wright

15  Tournament at the Country Club.

16  Q.    And what is the "Fred Wright Tournament"?

17  A.    It's a three-day member/guest tournament, it's the

18  premium tournament of the year for the club and, um,

19  typically you played 27 holes on Friday, 18 on Saturday,

20  and 18 on Sunday.  So for the most part the course is

21  closed.  Some people do go out after and play.

22  Q.    Why did you not play in that tournament?

23  A.    Well, I was involved in the due diligence.

24  Q.    But you went on Sunday?

25  A.    I typically, yeah, I had played in the tournament

1   for many years and a lot of people would come back year

2   after year so you got to know and become friends with a

3   lot of the guests.  So I went up that afternoon to meet

4   some of the guests that I had become friendly with over

5   the years.

6   Q.    Now, of those three days, June 6th, June 11th, and

7   June 13th, when you each have tabs at Oakley, do you

8   recall whether you saw the defendant on each of those

9   days?

10  A.    I did.

11  Q.    On which of those days do you believe you talked

12  about Wainwright?

13  A.    I believe it to be the 13th.

14  Q.    Why do you say that?

15  A.    Because I know on the day we talked about

16  Wainwright I had a fair amount of beers to drink and if

17  you compare the chit on the 6th versus the 13th, it's

18  apparent that I had more to drink on the 13th.

19        MR. FRANK:  So let me just call up Mr. Bray's and

20  Mr. O'Neill's chits from the 6th and just the two chits

21  with alcohol on them.  (On screen.)  I'm sorry, from the

22  6th.  (On screen.)  And we're just going to call these

23  up side by side.  (On screen.)  I think that's fine.

24  Q.    And, sir, could you identify -- again to the best

25  of your memory, what you were drinking here as reflected

1    on these chits?

2    A.    I'm going to refer to the paper ones.  I can't

3    really see this.

4    Q.    Sure.

5    A.    And you have up to the 6th.  I was drinking Coors

6    Light and Miller Light.

7    Q.    Okay.  So on the left chit of Mr. Bray, it looks

8    like there's one Miller Light?

9    A.    Um, I see that one Miller Light, yes.

10   Q.    And then on the right chit, which is your chit,

11   um, how many of those are your drinks?

12   A.    Um, there's just one Miller Light.

13   Q.    And is that consistent with your memory that you

14   didn't drink all that much on the 6th?

15   A.    Um, that's correct.

16   Q.    And who are these other -- there's a whole bunch

17   of other drinks on both of these chits.  Who were those?

18   A.    Well, my wife drinks wine, that could have been

19   her, but I'm not sure.

20        MR. MONAHAN:  Objection, your Honor.

21   Q.    Well, if you don't know --

22        THE COURT:  I'm going to treat that as a motion to

23   strike and strike the answer and he can put another

24   question.  Strike it out.

25   Q.    Were there other people in the bar on June 6th?

1    A.    Oh, yes.

2    Q.    Do you know if you and Mr. Bray were drinking all

3    these drinks or were those for others?

4    A.    No, I'm pretty sure they were other people's.

5    Typically when people would buy someone a drink, you

6    would reciprocate and turn around and buy them a drink.

7    Q.    Okay.  And now if we could take a look at two of

8    the chits from the 13th, the 6:45 p.m. chit and the

9    7:06 p.m. chit.

10    A.    (Looks.)  6:45 and 7:06?

11    Q.    Correct.

12    A.    Okay.

13    Q.    How many drinks that you think were yours do you

14    see on Mr. Bray's chit?

15    A.    There was one Miller Light and one Coors Light,

16    and I believe those two are mine.

17    Q.    Okay.  And what about on your own chit?

18    A.    (Looks.)  Um, one, two, three, four Coors Lights.

19    And a Bud light, a draft Bud Light.  A Heineken.  Those

20    would have been the beers I bought for other people, um,

21    who in turn had bought me a beer.

22    Q.    Okay.  So again based on those chits, what is your

23    best memory of when you spoke with Mr. Bray about

24    Wainwright?

25    A.    Um, I would say it was on the 13th.

1  Q.    At the time -- we've seen other drinks on these

2  chits besides yours and Mr. Bray's.

3  At the time you were talking about Wainwright

4  specifically, do you recall whether you were alone or

5  with others?

6  A.    Mr. Bray and I were alone at the bar.

7  Q.    So I want to direct your attention to that portion

8  of the conversation.

9  What do you recall you were talking about?

10  A.    Well, Mr. Bray leaned over to me -- he was sitting

11  with his back against the wall at the bar and I was

12  probably one or two stools removed sitting next to him

13  and we were alone and he leaned over and he said to me,

14  "Pat, I need to make a big score on my Watertown

15  project, do you have any stock tips for me, bank stock

16  tips for me?"

17  Q.    Now, prior to that point in the conversation had

18  you been talking about stocks?

19  A.    Um, not prior, no.

20  Q.    Had you been talking at all?

21  A.    Just general conversation.

22  Q.    And so when he leaned over to you and said he

23  needed to make a big score in connection with his

24  Watertown project, did you have an understanding of what

25  he was referring to by his "Watertown project"?

1    A.    I did.

2    Q.    And what was your understanding based on?

3    A.    Well, he had developed a condominium complex which

4    I believe was either complete or in the process of

5    completion, and that was Phase 1, and he was going to

6    develop a Phase 2, um, nearby the Phase 1 project, which

7    was to be a hotel with condominiums and some retail

8    outlets, I believe.

9    Q.    And how do you know that?

10   A.    Because he had told me so.

11   Q.    And when he told you that in connection with that

12   he needed to make a "big score," do you believe those

13   are the words he used, "big score," or are you

14   paraphrasing?

15   A.    No, those are his words.

16   Q.    Had he ever used those words with you before?

17   A.    Not to my knowledge.

18   Q.    You talked about stocks before?

19   A.    Yes.

20   Q.    Had he ever connected his investment in stocks

21   with a particular need for the money or use for the

22   money before that time?

23   A.    I'm sorry, I don't understand the question.

24   Q.    When you talked about stocks in the past --

25   A.    Right.

1  Q.    -- was it in the context of why he needed the

2  money?

3  A.    No.

4  Q.    And when he asked for a "tip to make a big score,"

5  what did you understand that to mean?

6  A.    Well, he wanted me to give him a stock tip that he

7  could trade upon.

8  Q.    How did you respond?

9  A.    I said to him, "Bob, like I've told you in the

10  past, the bank stocks I typically like, you know, are

11  nothing you can't read in the Boston Globe or the Herald

12  or the New York Times or the Wall Street Journal, and

13  those are, you know, the things I mentioned earlier,

14  like Belmont Savings, Cambridge Savings, um, Boston

15  Private Trust, and Brookline Bank," and I said, "This is

16  public information and again you could read it

17  anywhere."

18  Q.    And what happened next?

19  A.    Well, after that I took a napkin and I wrote the

20  word "Wainwright" on it and I slid it over to Mr. Bray

21  saying something to the effect, "This could be a good

22  one."

23  Q.    Were those your exact words or all your exact

24  words?

25  A.    Um, I don't recall the exact words, but they were

1    along that line.

2    Q.    "This could be a good one"?

3    A.    Yes.

4    Q.    And where did you get the napkin that you wrote

5    on?

6    A.    Right on the bar.

7    Q.    And what did you write with?

8    A.    I believe it was a golf pencil.

9    Q.    A golf pencil?

10   A.    Right.

11   Q.    And where did you get that?

12   A.    I believe from the bar also.

13   Q.    And what did the defendant do when you handed him

14   the napkin?

15   A.    He looked at it and he folded it up and put it in

16   his shirt pocket.

17   Q.    Did he say anything?

18   A.    Not really, no.

19   Q.    Was anyone else around?

20   A.    No, it was just me and Mr. Bray.  There were other

21   people in the club though.

22   Q.    Do you know if anyone saw you pass the napkin to

23   the defendant?

24   A.    I don't believe anyone did, no.

25   Q.    At the time you passed the napkin to the

1    defendant, what did you expect him to do with that

2    information?

3    A.    I expected that he would act upon it and trade.

4    Q.    Were you aware that what you were doing was wrong?

5    A.    Yes.

6    Q.    Why did you do it?

7    A.    I don't know to this day, although I did want to

8    help out Mr. Bray, he had done stuff for me in the past

9    and for my family and here was an opportunity for me to

10   return the favor.  I looked up to Mr. Bray and I figured

11   that doing this would enhance our relationship, he would

12   think more highly of me.

13   Q.    Did you have an expectation of whether he would

14   return the favor someday?

15   A.    Well, we're friends and that's what friends do,

16   they take care of each other.  I didn't expect anything

17   at that exact time, but down the road he did offer me an

18   interest in the Watertown project.

19   Q.    What did you do after he -- and we'll get back to

20   that in a moment.

21   But what did you do after you passed the napkin?

22   A.    I left shortly after that and went home.

23   Q.    Did you tell anyone what you had done?

24   A.    I told my wife, Sharon.

25   Q.    And why did you tell her?

1   A.    Because I was obviously very upset.  I knew I had

2   done something wrong.

3   Q.    Did there come a time, um, when you learned that

4   the defendant had actually bought shares in Wainwright?

5   A.    I did.

6   Q.    Tell us about that.

7   A.    It was one day probably late June of 2010, I was

8   leaving the club with my wife and Mr. Bray was walking

9   into the club and he looked at me and said, "Pat, I

10  bought that stock, I bought 20, 20-thou."

11  Q.    And what did you understand him to mean when he

12  said he bought "20 or 20-thou"?

13  A.    Well, I was hoping it wasn't 20,000 shares.

14        MR. MONAHAN:  Objection, your Honor, please.  Move

15  to strike.

16        THE COURT:  Yeah, I'm going to strike that, his

17  answer started about what he was hoping.  The question

18  was what did he understand that to mean?  And that I'll

19  allow him to answer.

20        What did you understand that to mean?

21  A.    I understood that to mean 20,000 shares.

22  Q.    Were you certain of that?

23        MR. MONAHAN:  Objection.

24        THE COURT:  No, I'm going to sustain that.  Yeah,

25  it's what he thought.

1    Q.    Did you say anything to him?

2    A.    I did not say anything.

3    Q.    Did there come a time when Wainwright was sold?

4    A.    There did.

5    Q.    When was that?

6    A.    Um, that was late June of 2010.

7    Q.    And did there come a time after that when you

8    spoke to the defendant about Wainwright again?

9    A.    I did, he thanked me one time in the parking lot.

10   Q.    Tell us about that.

11   A.    He said, "Pat, thanks for the tip.  I want to

12   bring you into the Watertown project."  And I said,

13   "Bubba, I can't go into the project, I don't have any

14   extra money lying around, I have three children that are

15   about to go to college."

16   Q.    And did he respond to that?

17   A.    No, not that I remember.

18   Q.    At that time -- I believe you testified it was in

19   July?

20   A.    That was early July, I believe.

21   Q.    Did you have an understanding as to why he was

22   thanking you?

23         MR. MONAHAN:  Well, objection again, your Honor.

24         THE COURT:  Sustained on that foundation.

25   Q.    Prior to July of 2010, had he ever offered you an

1    opportunity to invest in any of his projects?

2    A.    He had not.

3    Q.    Did you have an understanding as to why he was

4    offering you that opportunity at this time, did you have

5    an understanding?

6         MR. MONAHAN:  Objection.  Move to strike.

7         THE COURT:  Yeah, sustained on that foundation.

8    Q.    If I could show you what we've marked as Exhibit

9    8.  This is a collection of four photographs.  We'll go

10   through each of them.  (On screen.)

11   Do you recognize the first photograph?

12   A.    This is a picture of the parking lot in the

13   clubhouse.

14   Q.    And this is the Oakley Country Club?

15   A.    Yes, it is.

16   Q.    Would you look at the second photograph.  I

17   apologize.  It's a little underexposed.

18   A.    Yeah, it looks to me like a picture of the pub

19   upstairs on the second floor.

20   Q.    And the third photograph?

21   A.    A very similar picture of the pub.

22   Q.    And the last photograph?

23   A.    Um, again the parking lot of Oakley's.  It looks

24   like the picture is taken from the entryway looking out.

25   Q.    Directing your attention to the first photograph.

1   Well, actually, if you would look at -- sorry, I

2   apologize for that.  Let's look at the third photograph

3   first.

4        You testified that you spoke to the defendant

5   about Wainwright in the pub?

6   A.    I did.

7   Q.    Do you recall where you were sitting in the pub?

8   A.    Mr. Bray was sitting way over to the left with his

9   back against the wall and I was sitting about one to two

10  stools to his right.

11  Q.    You were at the bar?

12  A.    We were at the bar, yes.

13  Q.    Directing your attention to the first photograph.

14  You testified that there came a time when he told you he

15  had traded?

16  A.    Um, yes.

17  Q.    And, um, where was that, if you recall?

18  A.    Well, that was -- as you can see, again this is a

19  picture of the parking lot and the clubhouse as you're

20  looking at it.  So I was walking out with my wife and

21  Mr. Bray was walking in.  And it was probably pretty

22  close to the flag-pole area.

23  Q.    And I believe you testified that the second

24  conversation occurred in the parking lot?

25  A.    Um, it did.

1   Q.    Let's take a look at the last photograph.

2   Do you have a memory of where that happened?

3   A.    I'm not exactly sure.

4   Q.    (Pause.)  How do you remember where you were

5   sitting in the bar, um, in the pub?

6   A.    Well, again Mr. Bray typically sat in that corner

7   stool and again I was sitting at least one to two stools

8   over from him.

9   Q.    And I'm going to now show you what's been marked

10  as Exhibit 10.  (On screen.)

11        Do you recognize this document?  And again it's a

12  multi-page document and if it would be helpful for you

13  to look at the -- well, I should give you a hard copy.

14  (Hands to witness.)

15  A.    Do you want these back?

16  Q.    Yes, please.

17  A.    (Looks.)

18  Q.    Do you recognize this, sir?

19  A.    I do.

20  Q.    What is it?

21  A.    It's an internal document from Beverly Hoey, who

22  was the legal assistant for Eastern Bank, and it's

23  addressed to all of the participants who worked on the

24  due diligence.

25  Q.    And did you receive this e-mail?

1   A.      I did.

2   Q.      Can you tell us what date it was sent?

3   A.      (Looks.)  I believe it was the 25th of August.

4   Q.      It says "Wednesday, August 25th, 2010"?

5   A.      Right.

6   Q.      And do you know if you received it on that day?

7   A.      I did receive it on that day.

8   Q.      Did you review it on that day?

9   A.      I did.

10  Q.      And the e-mail says, at the bottom:

11          "You may be aware that the Financial Industry

12  Regulatory Authority, FINRA, is conducting a routine

13  investigation into trading activity in the stock of

14  Wainwright Bank & Trust Company that occurred

15  immediately prior to the announcement that Wainwright

16  would be acquired by Eastern Bank Corporation.  In

17  response to a request by FINRA, we have filed a report

18  detailing our processes and procedures in connection

19  with the acquisition including our actions to ensure the

20  confidentiality of nonpublic information about

21  Wainright.  We also provided FINRA with the names of all

22  individuals involved in the due diligence effort."  And

23  then it says:  "As a follow-up, FINRA has now requested

24  additional information from Eastern.  They have

25  forwarded a list of the names of individuals in

1    companies and have asked that we circulate these names

2    to our officers and directors to determine if any

3    Eastern personnel know of these individuals and

4    companies.  If any of these are known by Eastern

5    personnel, FINRA has requested that we advise them of

6    that fact as well as the nature of the relationship and

7    whether there has been any communications among the

8    parties during a certain period of time."  And then it

9    says in all capital letters:  "THIS REQUEST IS ROUTINE

10   AND THE FACT THAT ANY OF THESE INDIVIDUALS OR COMPANIES

11   ARE KNOWN BY EASTERN PERSONNEL IS NOT AN ISSUE OF

12   CONCERN UNLESS OF COURSE NONPUBLIC INFORMATION ABOUT

13   WAINWRIGHT HAS BEEN CONVEYED DURING THE PERIOD IN

14   QUESTION."  And then if you just jump down to the

15   second-to-last paragraph, it says:  "We have a very

16   short time frame within which to respond.  I will need

17   responses from each of you by the close of business on

18   September 2."

19        Did you understand that e-mail when you read it?

20   A.    I did.

21   Q.    Okay.  And, um, there are two attachments.  If you

22   would look at the second attachment first.

23   A.    (Looks.)

24   Q.    It appears to be a letter to the Chairman of

25   Eastern Bank from FINRA.  Do you see that?

1    A.    That's correct.

2    Q.    And it says in the third paragraph:

3    "With respect to individuals on the attached list, if

4    any of the individuals on the enclosed list are known to

5    the persons to whom this letter and enclosure are

6    circulated, please provide a detailed description of any

7    past or present relationship between the person at the

8    company and the individuals on the enclosed list,

9    including but not limited to," and then it calls for

10   various different types of information.

11        Do you see that?

12   A.    I do.

13   Q.    Did you read that at the time you received it?

14   A.    I did.

15   Q.    Now I'd like to direct your attention to the

16   second attachment.

17   A.    (Looks.)

18   Q.    It appears to be a list of names and cities.  Do

19   you see that?

20   A.    I do.

21   Q.    Did you review this list when you received it?

22   A.    Yes, I did.

23   Q.    And did anything catch your attention?

24   A.    Yes, certainly, Mr. Bray's name is on it.

25        MR. FRANK:  If you could just highlight that.

1          (Highlighted on screen.)

2     Q.    It says "Bray, Robert H., Cambridge,

3     Massachusetts"?

4     A.    That's correct.

5     Q.    And you saw that on August 25th?

6     A.    I did.

7     Q.    What did you do at that point?

8     A.    Well, after seeing this I quite panicked and I

9     left the bank and went home, and after I got home I

10    changed and I went looking for Mr. Bray.

11    Q.    When you left the bank, was that at the end of the

12    workday or during the workday?

13    A.    No, it was in the middle of the workday.

14    Q.    Why did you leave your job in the middle of the

15    day?

16    A.    Well, again I was quite panicked when I saw

17    Mr. Bray's name on this list.

18    Q.    So you went home?

19    A.    I went home.

20    Q.    And what did you do after you went home?

21    A.    Um, sometime after I went home I changed and then

22    I went looking for Mr. Bray.

23    Q.    Where did you look for him?

24    A.    I found him at Oakley Country Club up in the card

25    room.

1    Q.    This was on a Wednesday?

2    A.    This was a Wednesday, yes.

3    Q.    What typically happens at Oakley Country Club on

4    Wednesdays?

5    A.    Usually it's a big card night and a lot of members

6    show up to play cards and drink beer, have dinner,

7    socialize.

8    Q.    And did you find Mr. Bray?

9    A.    I did.

10   Q.    Where was that?

11   A.    He was in the card room.

12         MR. FRANK:  Your Honor, we're about to get into a

13   fairly lengthy --

14         THE COURT:  You want to stop?  We'll stop.  Is

15   that what you want?

16         MR. FRANK:  Yes, your Honor.

17         THE COURT:  All right.  We'll stop taking

18   testimony at this time.

```
 1           P R O C E E D I N G S
 2           (EXCERPT Continues.)
 3           (Begins, 9:30 a.m.)
 4           THE COURT:  Good morning.  I want to thank you so
    much for all your efforts to be here on time this
 5
 6    morning.  We really do appreciate it.  I do understand
 7    there was a tractor-trailer jackknifed somewhere, and I
 8    understand that it's winter, and we really do thank you,
 9    that because of your efforts, they're all ready to go
10    and that sets just the right tone.
11           Would you remind the witness that he's still under
12    oath.
13           THE CLERK:  I'd like to remind you, sir, that
14    you're still under oath.  Do you understand?
15           THE WITNESS:  I understand.
16           THE COURT:  There's a juror question here and I'll
17    ask the juror question here.
18           You testified yesterday that at one time your son
19    was an intern or in some fashion worked for Mr. Bray?
20           THE WITNESS:  He worked for Mr. Bray's architect.
21           THE COURT:  Right.  Was he paid for that work?
22           THE WITNESS:  Yes, he was.
23           THE COURT:  How did you feel about that?
24           THE WITNESS:  I didn't have an issue with it.
25           THE COURT:  You weren't against it, but did you
```

```
 1   feel warmly about it, think that that was a good
 2   opportunity for him?
 3           THE WITNESS:  It was a good opportunity for him,
 4   your Honor.
 5           THE COURT:  All right.  Thank you.
 6           And, Mr. Frank, you may continue.
 7           MR. FRANK:  Thank you, your Honor.
 8
 9   DIRECT EXAMINATION BY MR. FRANK:  (Continued.)
10   Q.    And just to follow up on that, Mr. O'Neill, when
11   was that?
12   A.    That was, I believe, 2009, the summer of 2009 when
13   he was a freshman at Northeastern University.
14   Q.    And when was the tip that you passed to Mr. Bray?
15   A.    That was June of 2010.
16   Q.    I see.  Thank you.
17   And what were your feelings toward Mr. Bray with respect
18   to that opportunity for your son?
19   A.    Well, I was pleased that he gave Matthew the
20   opportunity.
21   Q.    Thank you.
22           Where we left off yesterday, sir, you were talking
23   about Exhibit 10 which was an e-mail that you received
24   from the legal department at your bank.  Do you recall
25   that testimony?
```

1    A.    I do.

2          MR. FRANK:  And I'd like to call that exhibit up

3    again.

4          (On screen.)

5    Q.    And just to be clear, if you look at the exhibit

6    you see it was from Beverly Hoey at Eastern Bank to a

7    whole list of individuals.  Do you see that?

8    A.    I do.

9    Q.    And did you receive this e-mail?

10   A.    Yes, I did.

11         MR. FRANK:  And if we could just --

12   Q.    Where Ms. Gannon is highlighting, is that in fact

13   your name and was that your e-mail address at Eastern

14   Bank?

15   A.    Yes, it is -- or was.

16   Q.    And what was the date of this again?

17   A.    Um, August 25th, 2010.

18   Q.    Again this was the e-mail that attached the FINRA

19   letter and the list of names?

20   A.    That's correct.

21         MR. FRANK:  And again if we could just turn to the

22   list of names.

23         (On screen.)

24   Q.    Whose name was it that you saw on this list?

25   A.    "Robert H. Bray of Cambridge, Massachusetts."

1    Q.    And I believe you testified that after you

2    received this list you went looking for Mr. Bray at

3    Oakley, is that right?

4    A.    Yes, I did.

5    Q.    What happened when you got to Oakley?

6    A.    I'm sorry, the question?

7    Q.    What happened when you got to Oakley?

8    A.    Well, Mr. Bray was in the card room, um, and I

9    asked him to come out and talk with me, which he did,

10   and he and I went into the pub and sat down.

11   Q.    And what happened at that point?

12   A.    Well, I showed him this letter with his name on it

13   and he looked at it and he noticed that there were

14   several other people from Cambridge, Massachusetts

15   listed on the list of names also.

16   Q.    And did he remark on that fact?

17   A.    Um, no, nothing other than he said, "Oh, there are

18   a couple of other Cambridge people on the list."

19   Q.    And are there in fact other names of individuals

20   who appear to be from Cambridge on this list?

21   A.    Oh, yes, I see two or three of them.

22        MR. FRANK:  Ms. Gannon, could you just highlight

23   those.

24        (Highlights on screen.)

25   A.    Actually there's two others -- three others -- no,

1     there's two others than Mr. Bray.

2     Q.     And what happened after he pointed out that there

3     were other people from Cambridge on this list?

4     A.     Well, I simply asked Mr. Bray what he had done and

5     he told me that he had, um, bought blocks of shares in

6     Wainwright Bank because it was thinly-traded, so you

7     could only buy it in blocks, meaning you could buy it in

8     2,000 or 3,000 or 4,000 shares at a time.

9     Q.     Now, when you testified just now you made a motion

10    with your hand.

11    A.     Right.

12    Q.     What was that about?

13    A.     That's the motion Mr. Bray used for the blocks.

14    Q.     What did you understand that motion to mean?

15    A.     A block of shares that he had purchased.

16    Q.     And did he, at any time in this conversation, tell

17    you how much Wainwright stock he had purchased?

18    A.     I believe he just said, at the time, "20,000."

19    Q.     And how do you respond?

20    A.     Well, he knew I was quite upset and I said to him,

21    "Bob, I can lose my job over this," and he said to me,

22    "Pat, don't worry, I haven't told anybody."  And he

23    said, "I did my research on this bank.  I really like

24    the bank.  It's a green bank.  They have a branch around

25    the corner from my own office.  It pays a nice dividend.

1   So you don't have to worry."

2   Q.    Now, you said that he hadn't told anybody?

3   A.    That's what he had said, yes.

4   Q.    What did you understand him to mean by that?

5   A.    That he kept it a secret that I had given him a

6   tip.

7   Q.    And he said it was a "green bank"?

8   A.    It was a "green bank."

9   Q.    Did you have an understanding of what that meant?

10   A.    Um, I believe so.

11   Q.    What did you understand that to mean?

12   A.    Yes, that it's a conscience bank when it comes to

13   recycling, et cetera.

14   Q.    And at any time in that conversation did you

15   discuss the fact that this letter came from --

16   A.    I'm sorry, that it came from --

17   Q.    Regulators.

18   A.    He mentioned to me that the regulators, he said,

19   "Don't worry if the regulators come around asking

20   questions, Pat, I'll have them wishing that they had

21   bought the stock."

22   Q.    And what did you understand that to mean?

23         MR. MONAHAN:  Objection, your Honor.

24         THE COURT:  No, overruled.  He may tell us his

25   understanding.

```
1    A.    My understanding --

2          THE COURT:  You see what I do isn't rocket

3    science.  He can't say what's going on in Mr. Bray's

4    mind.  You may be able to draw conclusions, you can draw

5    inferences when you've heard all the evidence, but he

6    doesn't know and he can't say.  But when he's talking to

7    someone, I'm going to let you hear what he got out of it

8    to help you understand what was going on.

9          And that's the question, what did you get out of

10   it?

11   A.    My understanding was that he was not going to tell

12   the regulators what he had done or what I had done in

13   giving him a tip.

14         MR. MONAHAN:  Objection, your Honor.  Move to

15   strike.

16         THE COURT:  The motion to strike is denied.

17   Q.    What else did you discuss in that conversation?

18   A.    Well, as the conversation went on he said to me,

19   he said, "Pat, again don't worry, you know, I'll bring

20   you into the Watertown project for free."

21   Q.    When he referred to bringing you into the

22   Watertown project, what project did you understand him

23   to be referring to?

24   A.    That was the project that I referred to yesterday,

25   he had a two-phrase development being done over in
```

1    Watertown, Massachusetts, right in the square.

2    Q.    Was there anything more of substance in that

3    conversation that you can recall?

4    A.    Not that I remember.

5    Q.    What did you do after that?

6    A.    Um, I left and went home.

7    Q.    Now, as you'll recall from this e-mail --

8          MR. FRANK:  I think, Ms. Gannon, look at the

9    second page of the e-mail.

10         (On screen.)

11   Q.    If we look at the second-to-last paragraph.

12         MR. FRANK:  The second-to-last paragraph.

13         (On screen.)

14   Q.    It says, "I will need responses from each of you

15   by the close of business on September 2nd."

16   And again you received this on August 25th?

17   A.    That's correct.

18   Q.    Did you respond to the e-mail by September 2nd?

19   A.    I did not.

20   Q.    What did you do?

21   A.    Well, from the time I went home until September

22   2nd I became seriously ill and I was admitted to an

23   outpatient clinic and I had two vials of saline solution

24   injected into my system.  I was coming down, I think,

25   with pneumonia.

1    Q.    And were you out of the office for a while?

2    A.    I was out, I took just about a week off.  I was

3    scheduled to take vacation that week anyway.

4    Q.    Oh, you were?

5    A.    I was, yes.

6    Q.    And during the time you were on vacation, did you

7    hear from anyone at the bank about the FINRA letter?

8    A.    I did, Mr. Sullivan, my boss, was trying to reach

9    me.

10   Q.    How was he trying to reach you?

11   A.    Um, via the telephone, he had called several times

12   asking me why I had not signed the letter.

13   Q.    And how did you respond to your boss?

14         MR. MONAHAN:   Objection.

15         (Pause.)

16         THE COURT:  Come to the sidebar.

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10          (In open court.)
11          THE COURT:  So I take it that question's withdrawn
12   and you may --
13          MR. FRANK:  I'll withdraw that, your Honor.
14          THE COURT:  You go right ahead.
15          MR. FRANK:  Thank you, your Honor.
16   Q.    Did there come a time when you returned to the
17   office?
18   A.    There did.
19   Q.    And do you recall when that was?
20   A.    It was the following Monday after my vacation.  I
21   forget the exact date.
22   Q.    What happened when you returned to the office?
23   A.    Mr. Sullivan called me into his office and he
24   showed me a letter from the HR department which
25   basically said if I did not sign the FINRA letter, that
```

1   I would be subject to termination.

2   Q.    Without telling me what you said, did you respond

3   to the FINRA letter?

4   A.    I did not.

5   Q.    What did you do instead?

6   A.    I left the office that afternoon and I went out to

7   Western, Massachusetts to my brother and my sister-in-

8   law's house, both of whom are attorneys.

9   Q.    And at any point did you respond to the FINRA

10  letter?

11  A.    I did not.

12  Q.    What did you do?

13  A.    Well, while I was at my brother's house --

14  Q.    And again I'm not asking you for anything you

15  said, but what action did you take, if any?

16  A.    Well, I ultimately resigned from the bank.

17  Q.    At the time you resigned from the bank -- well,

18  withdrawn.

19   Why did you not respond to the FINRA letter?

20        MR. MONAHAN:  Objection.

21        THE COURT:  Yeah, he's already expressed --

22  sustained.

23  Q.    At the time you resigned from the bank, how much

24  were you earning?

25  A.    I was earning a base pay of $185,000 plus a bonus

1    of about 50 to 100,000 annually, plus an executive stock

2    option plan, plus a pension, all of which probably added

3    up to about 2 to $2 1/2 million in lost money since this

4    incident occurred.

5    Q.    Did you have another job lined up when you

6    resigned?

7    A.    I did not.

8    Q.    How much of that package that you just described

9    did you get to keep when you resigned?

10   A.    None of it.

11   Q.    At around this time did there come a time when you

12   did anything with respect to your house?

13   A.    We -- the house was in both my wife's and my own

14   name and we transferred it over to my wife's name.

15   Q.    Why did you do that?

16   A.    To protect the asset.

17   Q.    From what?

18   A.    From being taken or someone putting a lien on it.

19   Q.    Did there come a time when you ultimately found

20   another job?

21   A.    There did.

22   Q.    And how long was that from the time you resigned?

23   A.    I found a job about 6 months later at TD Bank.

24   Q.    Did it pay as much as your old job?

25   A.    No, it did not.

1    Q.    Remind us what happened to you in August of 2014?

2    A.    I was arrested --

3          MR. MONAHAN:  Objection.

4    A.    -- in August of 2014.

5          THE COURT:  That may stand.

6    Q.    And after your arrest did there come a time when

7    you pled guilty to a crime?

8    A.    Yes, I did.

9    Q.    When was that?

10   A.    In December of 2014.

11   Q.    What crime did you plead guilty to?

12   A.    Insider trading.

13   Q.    In connection with your plea, did you enter into a

14   cooperation agreement with the government?

15   A.    I did.

16   Q.    I'd like to show you what we've marked as Exhibit

17   11.  (Shows.)  This is a multi-page document.  I'd ask

18   you to look at the document and tell us what it is?

19   A.    (Looks.)

20   Q.    Do you recognize this document, sir?

21   A.    I do.

22   Q.    What is it?

23   A.    It's my plea agreement.

24   Q.    And I'd ask you to turn to the final page of the

25   agreement.

1  A.    Yes.

2        THE COURT:   What number is this?

3        MR. FRANK:   This is Exhibit 11, your Honor.

4        THE COURT:   Thank you.

5  Q.    Whose signature is that under "acknowledgement of

6  plea agreement"?

7  A.    It's "John Patrick O'Neill," my signature.

8  Q.    And the date?

9  A.    It's 10-30-2014.

10 Q.    Have you been sentenced following your conviction?

11 A.    I have not.

12 Q.    What is your understanding of the maximum sentence

13 you face?

14 A.    My understanding is that it's 5 years in prison.

15 Q.    What is the minimum, in your understanding?

16 A.    Um, it could be no time in prison.

17 Q.    Have you spent any time in jail or in prison since

18 pleading guilty?

19 A.    I have not.

20 Q.    Does this agreement, um, contain the terms of your

21 cooperation with the government?

22 A.    Yes, it does.

23 Q.    What is your understanding of what you have agreed

24 to do under your cooperation agreement?

25 A.    My understanding is that if I tell the truth the

1    government will go to bat for me and hopefully it will

2    end up with -- talking to the judge, it will end up with

3    a lighter sentence.

4    Q.    What is your understanding of what happens if you

5    don't tell the truth?

6    A.    I'll commit perjury and obstruction of justice.

7    Q.    Do you know whether the judge is required to give

8    you a lower sentence if you tell the truth?

9    A.    He is not.

10   Q.    Are you hoping that he will?

11   A.    Um, of course I'm hoping he will.

12   Q.    Who will decide your sentence?

13   A.    Ultimately the judge.

14         MR. FRANK:  No further questions.

15         THE COURT:  Mr. Monahan, any questions?

16         MR. MONAHAN:  Yes, your Honor.

17         THE COURT:  You may.

18

19   CROSS-EXAMINATION BY MR. MONAHAN:

20   Q.    Good morning, Mr. O'Neill.

21   A.    Good morning, Mr. Monahan.

22   Q.    Mr. O'Neill, when did you first join Oakley

23   Country Club, what year, if you remember?

24   A.    Well, my daughter was just born and she's 22 years

25   old, so 22 years from today would be --

1  Q.    And it would be fair to say, would it not, that

2  when you joined Oakley Country Club you came in and one

3  of the first things you tried to do is meet some of the

4  people at the new club?

5  A.    That's a fair statement.

6  Q.    And it would be fair to say that one of the first

7  people you met was Mr. Bray?

8  A.    I don't remember exactly when I met him, but I

9  believe I met him early on.

10  Q.    Probably in the first year?

11  A.    Probably in the first year.

12  Q.    And that would have been 22 years ago?

13  A.    Approximately.

14  Q.    And it would be fair to say, would it not, that in

15  the process of coming to know him you were casual

16  friends?

17  A.    I would say we were good friends.

18  Q.    Well, did he ever come to your house other than

19  the two times you said that he did some work at the

20  home?

21  A.    I believe he could have come to my house.  I think

22  he could have been there for Matthew's graduation party.

23  Q.    Are you sure he went there for that graduation

24  party?

25  A.    I'm not sure, but he could have been.

1  Q.    Well, in any event, so in that 22 years there may

2  have been one occasion in which he came to your house

3  socially as a result of being invited to your son's

4  graduation party?

5  A.    Well, it could have been more than once.  I'm not

6  sure.

7  Q.    Well, was he invited to any christenings, birthday

8  parties, anything like that, do you remember?

9  A.    He was invited to a lot of parties at my house.

10  Q.    Did he ever go?

11  A.    He's been to a few, as far as I remember, as I

12  said.

13  Q.    Other than the birthday party -- excuse me, the

14  graduation party, what other ones?

15  A.    I don't remember, Mr. Monahan.

16  Q.    Okay.  So in any event it would be fair to say,

17  would it not, that your contact with Mr. Bray was

18  primarily at Oakley Country Club, at the club?

19  A.    At the club and, I mean, we used to meet outside

20  on occasions.

21  Q.    Outside where?

22  A.    At some local establishments.

23  Q.    Like which ones?

24  A.    Connolly's Bar, Donovan's bar, um, we went out to

25  dinner one night to have Chinese food with a bunch of

1    friends.

2    Q.    When was the last time you went to Connolly's Bar

3    if you can remember?

4    A.    Me personally?

5    Q.    Yes, with Mr. Bray.

6    A.    With Mr. Bray?  I don't remember off the top of my

7    head.

8    Q.    5 or 6 years ago?

9    A.    I think it's been sooner than that.

10   Q.    4 years ago?

11   A.    I think it's been sooner than that.

12   Q.    And you said Donahue's Bar, is that the other bar

13   you mentioned?

14   A.    Donovan's Pub.

15   Q.    And when was that, if you can remember?

16   A.    It was certainly within the last 5 years.

17   Q.    Within the last 5 years.

18   But it would be fair to say, would it not, that

19   primarily your contact with Bray, Mr. Bray, was at

20   Oakley Country Club?

21   A.    I think I stated that yesterday, yes.

22   Q.    And what would happen primarily is that you would

23   see him, would you not, after a round of golf?

24   A.    Not necessarily.

25   Q.    Well, how many times have you played golf with him

1   in the 22 years that you had belonged to Oakley Country

2   Club?

3   A.    I think I acknowledged that yesterday that I

4   played maybe 5 or 6 or 7 times.

5   Q.    You said 5 or 6, correct?

6   A.    All right.

7   Q.    So 5 or 6 in 20 years.  Would you agree with me

8   that's like once every other year?

9   A.    If you're doing the math correctly, you're right.

10  Q.    Approximately, is that right?

11  A.    Approximately.

12  Q.    And as you told us yesterday, there's a system of,

13  kind of like a caste system, where the good players play

14  with the good players and the other players play with

15  people of similar talent?

16  A.    That's correct.

17  Q.    And you described your group as "CSE"?

18  A.    That's correct.

19  Q.    Okay.

20  A.    I played with them a lot, but not every time, not

21  every weekend.

22  Q.    Well, you just told us you played with him

23  probably once every other year, is that what you just

24  told us?

25  A.    I'm talking about my group, my "CSE."

1  Q.    Oh, I'm sorry, you played with the CSE group a

2  lot.

3  A.    Yes.

4  Q.    Okay.  And addressing your attention to, um --

5  June 6th.  Do you remember playing with that group that

6  day?

7  A.    I don't believe I played with that group that day.

8  Q.    And in terms of trying to figure out what happened

9  on June 6th or June 13th, you had occasion to review

10  some chits, correct?

11  A.    I did.

12  Q.    And when you reviewed your chits you then, looking

13  at the chits, looking at -- did you look at the tee

14  sheets that day?

15  A.    Um, I saw something resembling tee sheets.

16  Q.    And based on that determination you were able to

17  find out or ascertain who you played golf with that day,

18  correct?

19  A.    I -- you can ascertain who you played golf with

20  that day by looking at the tee sheets, but I didn't look

21  at the actual tee sheets.

22      MR. MONAHAN:  Your Honor, may I approach the

23  witness?

24      THE COURT:  You may.

25      (Pause.)

1   Q.    I'm going to ask you if you could identify this

2   document?

3   A.    This is a June 6th, 2010 --

4         MR. FRANK:  Objection, your Honor.

5         THE COURT:  Yeah, he didn't ask you to read from

6   it.  See this one isn't in evidence yet, so that's why

7   he's objecting.  But the question is an appropriate one,

8   can you identify it?  Do you recognize it?

9         THE WITNESS:  Yes, I do, your Honor, it's a tee

10  sheet.

11  Q.    It's a tee sheet for June 6th, is it not?

12        THE COURT:  Mr. Monahan.

13        MR. MONAHAN:  Oh, I'm sorry.

14        (Steps back.)

15  Q.    And being the tee sheet for June 6th, that

16  indicates the four-somes that played golf on that

17  particular day?

18  A.    That's correct.

19  Q.    And this is the custom and practice, within Oakley

20  Country Club, is that when you play golf or sign up for

21  golf on the weekend, you sign up with your four-some and

22  they give you a tee time, correct?

23  A.    That's correct.

24  Q.    And addressing your attention to 11-30 --

25  A.    -- 2, 11:32.

1    Q.    Oh, I'm sorry, 11:32.  There's an indication

2    there, is there not, as to you playing at that time?

3    A.    There is.

4    Q.    Okay.  And you have reason to believe that that's

5    when you played, correct?

6    A.    That's what it says.

7    Q.    Well, you believe that to be true, correct?

8    A.    I do.

9    Q.    All right.  And you played with, it says, does it

10   not, three other people?

11   A.    Yes, it does.

12   Q.    Were they part of the CSE group?

13   A.    No, they were not.

14   Q.    Okay, they were just friends of yours?

15   A.    They were just friends.

16   Q.    Okay.  And from looking at the sheet, can you also

17   make a determination whether or not Mr. Bray played that

18   day?

19   A.    He did.

20   Q.    And what time was that?

21   A.    It looks to be 9:24, but then there's a 9:28

22   indication right next to it.

23   Q.    You have no reason to believe that that's true,

24   correct?

25   A.    No reason not to.

1   Q.    Okay.  So the custom and practice -- the custom

2   and practice was you would tee off and you would play 18

3   holes, correct?

4   A.    That's correct.

5   Q.    And after you played the 18 holes you would go in

6   and you'd have something to eat and something to drink

7   with your fellow competitors?

8   A.    Usually, but not every time.

9   Q.    Did that happen on this day, if you remember, on

10  June 6th?

11  A.    I remember drinking that day.

12  Q.    Do you remember playing golf that day?

13  A.    I do.

14  Q.    How long does it usually take to play a round of

15  golf?

16  A.    I know you have to complete a round in 4 hours and

17  10 minutes.

18  Q.    Okay.  And you have no reason to believe that that

19  didn't happen in this case, correct?

20  A.    No reason to believe that.

21  Q.    So that gets you through to what now, 3:30?

22  A.    Or thereabouts.

23  Q.    And is there a custom and practice at Oakley where

24  the winners buy the losers drinks?

25  A.    That's a custom at most golf courses that I know

1    of.

2    Q.    Is it at Oakley?

3    A.    Yes.

4    Q.    And in this particular case after the round your

5    memory is that you went in and you had something to

6    drink and probably something to eat?

7    A.    Probably.

8    Q.    And this was about 3:30, correct?

9    A.    Correct.

10   Q.    All right.  And the day that you and Mr. Bray had

11   the conversation about Wainwright Bank you told us

12   yesterday it was either the 6th or the 13th, correct?

13   A.    That's correct.

14   Q.    And you told us that you remembered on the day

15   that you gave him the information that you played golf?

16        MR. FRANK:  Objection, misstates it.

17   A.    I did not say that.

18   Q.    Okay.  Well, do you have a memory as to whether

19   you did?

20        THE COURT:  All right.  The objection is --

21        MR. MONAHAN:  No, I'm sorry.

22        THE COURT:  No, the objection is mooted by his

23   answer, so we'll deny it.  Go ahead.

24        The testimony is the testimony of the witness, not

25   what the question suggests.  It's up to you whether you

1    believe the witness, disbelieve the witness, or believe

2    parts of what a witness says.

3             Okay.  Go ahead.

4    Q.    (Pause.)  You gave a statement to some FBI agents

5    relative to this case, correct?

6    A.    I don't remember.

7    Q.    Do you remember talking to some agents and

8    describing what your best memory was as to what happened

9    at or around the time of the tip, or the information?

10   A.    I could have.  I talked to a lot of people.

11   Q.    You also made an agreement with the government

12   that you would tell them the truth about everything in

13   terms of what you remembered about that particular day?

14   A.    That's true.

15   Q.    And you'd agree with me, would you not, that you

16   were being asked what happened approximately four years

17   and three months previous?

18   A.    At what time are you referring to?

19            MR. MONAHAN:  May I approach the witness, Judge?

20            THE COURT:  You may.

21   Q.    Let me show you this document and ask you if you

22   could identify --

23            MR. FRANK:  Objection, your Honor.

24            THE COURT:  No, he may be shown the document to

25   see if he recognizes it.

1   A.      I've never seen this document.

2           THE COURT:   That's his answer.

3   Q.      Do you remember giving a statement to some FBI

4   agents?

5   A.      As I said a moment ago, I could have, but I don't

6   remember off the top of my head.

7   Q.      Do you remember -- well, I'm going to ask you if

8   you could read this to yourself right here.   I'm

9   referring to Page 2, the last paragraph.

10  A.      (Reads.)   Yes.

11  Q.      Does that help you recall what happened on June

12  6th and June 13th in terms your best memory?

13  A.      Well, you didn't ask me about June 13th.

14  Q.      I'm asking you about June 6th right now?

15  A.      Okay.   It does.

16  Q.      And as a result of reading this, can you tell

17  us -- and excuse my back.

18          Could you tell us whether or not your memory is

19  refreshed as to on the day that you and Mr. Bray had the

20  conversation about Wainwright, whether or not it was the

21  day you played golf?

22  A.      The document says that I --

23          MR. FRANK:   Objection.

24          THE COURT:   Yeah, he's got a right to object.   The

25  question is not what the document says, but does that

1    document jog your memory?  Do you have a memory?  That's

2    what he's asking.  And his question is framed like this:

3            Now, I've shown you the document.  Now, do you

4    have a memory that on that day you played golf?  That's

5    the question.  Do you have a memory?

6    A.    I have a memory of playing golf on that day, yes.

7            THE COURT:  All right.  That's his answer.

8    Q.    And do you have a memory as to whether or not that

9    was the day, after you played golf, that you and

10   Mr. Bray had the conversation about Wainwright?

11   A.    I have a memory that it happened on the 6th or the

12   13th as I have said in the past.

13   Q.    And did you tell an FBI agent that the day that

14   you had the conversation with Mr. Bray was the day that

15   you played golf?

16   A.    According to that document, yes, but it also says

17   it could have been the 13th.

18   Q.    You would agree with me, would you not, that you

19   did play golf on the 13th?

20   A.    I did not play golf on the 13th.

21   Q.    Because, as you told us yesterday, the flagship

22   golf tournament at Oakley Country Club is the Fred

23   Wright Memorial, right?

24   A.    That's correct.

25   Q.    And that's a three-day tournament as you told us

1    yesterday?

2    A.    That's correct.

3    Q.    And the course is closed down basically for that

4    tournament?

5    A.    That's not necessarily true, it's opened up after

6    the tournament.

7    Q.    It's opened up at what, 3:00, 3:30 in the

8    afternoon?

9    A.    Yes.

10   Q.    And in any event you didn't play golf on the 11th

11   or 12th or the 13th?

12   A.    Not that I remember.

13   Q.    And you played on the 6th?

14   A.    I played on the 6th.

15   Q.    And after you played golf on the 6th, yesterday

16   you told us that at about 3:30 you went in and had

17   drinks and had probably something to eat, correct?

18   A.    I don't remember if I ate or not.

19   Q.    Okay.  And you stayed at Oakley Country Club,

20   correct?

21   A.    I'm sorry?

22   Q.    You stayed at Oakley Country Club until sometime

23   after 7:00?

24   A.    I don't know that to be true.

25   Q.    Well, you told us yesterday that you reviewed your

1  chits, correct?

2  A.    Yes.

3  Q.    And in reviewing your chits it helped jog your

4  memory in terms of what you had your last drink?

5  A.    I don't remember saying that.

6       MR. MONAHAN:  Might I approach the witness again,

7  Judge?

8       THE COURT:  You may.

9  Q.    I'm going to ask you, if you would, if you would

10  just take a -- and I think you looked at these

11  yesterday, but take a look at what appears to be some

12  Oakley Country Club chit details and I ask if you can

13  identify them?  Just carefully look through them, if you

14  would.

15  A.    (Looks.)  This is an O'Neill chit on June 6th,

16  time-stamped 6:29.  An O'Neill chit on June 6th, time-

17  stamped 6:29.  A Bray chit on June 10th, time-stamped

18  7:05.

19  Q.    Excuse me?

20  A.    I'm sorry, June 6th, time-stamped 7:05.  There's

21  an O'Neill chit on June 6th, time-stamped 6:29.  And I

22  haven't seen this document before.  It looks to be

23  Mr. Bray's itemization for the end of the month of June.

24  I don't know.  And there's one last chit here on June

25  6th, under my name, time-stamped 6:29.

1    Q.    There's also your bill for June for 6:29, correct?

2         MR. FRANK:   Your Honor, I'm not sure what document

3    he thinks he --

4         MR. MONAHAN:   Oh, I'm sorry, Exhibit 9.

5         MR. FRANK:   Exhibit 9 does not have a --

6         THE COURT:   Please.   Please.   You don't

7    characterize it.

8         MR. FRANK:   Sorry, your Honor.

9    A.    I have not seen this chit before.

10   Q.    Okay.   I'm sorry.

11   Well, in my event you'd agree with me that according to

12   the document, um, marked 6:29 with your name on it, that

13   at that time you ordered or paid for some drinks with

14   some other people that you were with?

15   A.    (Looks.)   I'm sorry, at 6:29?

16   Q.    Yes.

17   A.    You must understand, Mr. Monahan, that that time

18   stamp has no bearing on when you buy drinks, that time

19   stamp is when the bartender cashes out for the night and

20   takes everyone's chits and he --

21   Q.    Well, he cashed out your chit that night, correct?

22   A.    Looks like he did, yes.

23   Q.    Okay.

24   A.    But that doesn't necessarily mean I was there till

25   6:29.

1   Q.    Well, that's after last call for you, is it not?

2   A.    I don't understand your question.

3   Q.    Well, isn't it the custom that you sign your

4   chits?

5   A.    Nobody at Oakley signs the chits, or very few

6   people.

7   Q.    There's a place for a member's signature here,

8   correct?

9   A.    Right.

10  Q.    So you'd agree with me the document says that you

11  were checked out at 6:29, correct?

12  A.    That's not necessarily true.

13  Q.    The document says you were checked out at 6:29?

14  A.    That's the date that he time-stamped it.  It

15  doesn't mean --

16  Q.    That --

17        THE COURT:  Please, let him answer.

18  A.    It doesn't mean that I checked out at 6:29, I

19  could have checked out well before that.

20  Q.    What time did you leave, if you remember, more

21  than 4 years ago at Oakley Country Club?

22  A.    I don't remember.

23  Q.    According to this there was a Mich Ultra -- and

24  you know that Mr. Bray drinks Mich Ultra, correct?

25  A.    That's correct.

1  Q.    And you drink Miller Light, correct?

2  A.    That's correct.

3  Q.    And then there's two house wines, another house

4  wine glass, an Amstel, and a St. Pauli Girl, right?

5  A.    That's right.

6  Q.    So that would indicate, would it not, that you

7  were there probably drinking with Mr. Bray and several

8  other people?

9  A.    That's correct.

10  Q.    And the custom and practice at Oakley Country

11  Club, and I expect at most country clubs, is that if you

12  buy a round of drinks, then someone else buys a round of

13  drinks, right?

14  A.    That's correct.

15  Q.    And there were six other people on that tab with

16  different drinks with you on that night, correct?

17  A.    I didn't count them.

18  Q.    Well, that's what it says, trust me, six other

19  people?

20       MR. FRANK:  Objection.

21       THE COURT:  Well, is that a question?

22       MR. MONAHAN:  I'm sorry.

23       THE COURT:  You're withdrawing that?  He says he

24  didn't count them.

25       MR. MONAHAN:  I'm withdrawing it, your Honor.

1          THE COURT:  All right.

2     Q.    You just take a look at that and tell me how many

3     drinks are on that chit?

4     A.    There appear to be six drinks on this chit.

5     Q.    Thank you.  So it would be fair to say, would it

6     not, that there were six other people -- there were five

7     other people with you at that time?

8     A.    Likely four.

9     Q.    Did someone buy two drinks?

10    A.    If I bought Mr. Bray a drink, a Mich Ultra, and I

11    had one, that makes four.

12    Q.    Oh, so there were you and five other people,

13    correct?

14    A.    Including Mr. Bray.

15    Q.    You and five other people, correct?

16    A.    Correct.

17    Q.    Okay.  And do you know whether you had anything to

18    drink before that?

19    A.    I don't make it a habit to drinking on the golf

20    course.

21    Q.    Well, this is -- do you remember -- you said you

22    left the golf course at 3:30?

23    A.    I said I left the golf course at approximately

24    3:30, it could have been 3:45.

25    Q.    It could have been 3:20, too, right?

1   A.    It would have been 3:15, 3:20, depending on how

2   long the round took.

3   Q.    And usually as to whether or not a round will take

4   4 hours and 10 minutes, which is the max, or 3 hours and

5   40 minutes, one of the considerations is whether or not

6   the group in front of you is slowing you down?

7   A.    You're asking me a question?

8   Q.    Yes.

9   A.    Yes.

10  Q.    (Pause.)  According to this tee sheet -- strike

11  that.

12  Would you just take a look at this tee sheet and tell

13  us, based on that, whether there were any open holes in

14  front of you?

15       MR. FRANK:  Objection.

16       THE COURT:  No, he may be asked that.  If he can.

17       MR. FRANK:  Your Honor, I'm objecting because the

18  document's not in evidence.

19       THE COURT:  No, he may be shown the document.  Oh

20  I see, based on that -- no, there's something to that,

21  the document's not in evidence.  So he can't base it on

22  that without --

23       Do you want it in evidence?

24       MR. MONAHAN:  I do, Judge.

25       THE COURT:  Any objection?

1       MR. FRANK:  No, your Honor.

2       THE COURT:  All right.  Well, now it is in

3   evidence.

4       And what's the next number?

5       THE CLERK:  26.

6       THE COURT:  All right, this will be Exhibit 26 in

7   evidence.

8       (Exhibit 26, marked.)

9       THE COURT:  And so now, based on that, was there a

10  party in front of you?

11      (Silence.)

12  Q.    Based on looking at that document, can you tell us

13  whether or not there were any open holes in front of

14  you?

15  A.    It appears that there was no one playing in front

16  of us or in front of that other person -- well, there

17  were two open slots and the time slots are 8 minutes

18  apart, so approximately 15 or 16 minutes no one had

19  played in front of us.

20  Q.    So you basically had an open course for a few

21  holes, correct?

22  A.    Maybe.

23  Q.    Are you saying the tee sheet's wrong?

24  A.    I'm not saying the tee sheet's wrong, that's not

25  the pace we play.

1    Q.    Do you remember anything about that day, about the

2    playing golf?

3    A.    I already told you I remember playing golf that

4    day.

5    Q.    And you don't remember playing with these three

6    people, do you?

7    A.    Vaguely.

8    Q.    Okay.  And do you remember what you had to drink

9    after you were through playing golf, other than what's

10   on that chit?

11   A.    Probably just what's on that chit.

12   Q.    Okay.  And so your memory, as you come before us

13   today, is that all you had to drink that day was what's

14   on that chit?

15   A.    I don't know that to be true.

16   Q.    Well, what did you have to drink that day, if you

17   remember?

18   A.    Well, I had at least one Miller Light and there's

19   a Michelob Ultra on that, so that means Mr. Bray

20   probably would have bought me a Miller Light, too.  So I

21   had at least two Miller Lights.

22   Q.    Assuming that the date of the tip was on -- or the

23   information was on June 13th, how much did you have to

24   drink that day?

25         MR. FRANK:  Objection.

1          THE COURT:  Overruled.

2     A.    I know I drank more on the 13th than I did on the

3     6th simply by reviewing the chits.

4          MR. MONAHAN:   Exhibit Number 9.

5          (Hands to witness.)

6     Q.    I'm going to show you what purports to be your

7     chit on June 13th.  I'm going to ask if you could

8     identify that, Exhibit Number 9?

9     A.    I recognize it, yes.

10    Q.    Well, what do you recognize it to be?

11    A.    A June 13th chit under my name.

12    Q.    And it indicates, does it not, that there's a

13    Miller Light there, correct?

14    A.    I drink Miller Light and Coors Light.  So there's

15    one, two, three, four Coors Lights, um, two Mich Ultras,

16    I've been known to drink Heineken, a Draught Bud Light

17    and Bud Light bottle.

18    Q.    So are you telling us on that day you probably

19    drank a Heinken, a Coors Light -- two Coors Lights, is

20    that what you're telling us?

21    A.    (Looks.)  At least four Coors Lights, maybe a

22    Heineken, but then you have a Bud Light bottle and maybe

23    a draught Bud Light, and maybe the Heineken.  As you

24    indicated yourself, it's customary to reciprocate

25    drinks.  If you buy someone a drink at a club, they

1    typically buy you a drink also.  So I could technically

2    have had one, two, three, four, five, six, seven, eight,

3    nine drinks that day.

4    Q.    And the same would apply to the other day too,

5    June 6th?

6    A.    That's correct.

7    Q.    You could have had many drinks because at this

8    point, four and a quarter years later, we can't tell who

9    bought drinks for you, all we know is what you, in

10   terms, had as a bar bill that day, whether you drank it

11   yourself or whether you bought it for someone else?

12   A.    I guess so, yes.

13   Q.    All right.

14         Now, when you spoke to -- when you reviewed the

15   document that I just showed you a few moments ago about

16   your statement to the FBI agent, you'd agree with me

17   that, according to that document, you said that the day

18   that you gave the information was the day you played

19   golf?

20         MR. FRANK:  Objection.

21         THE COURT:  No, sustained on that foundation.

22   (Pause.)  Um, no, I misspoke.  Overruled.  You may

23   answer the question.

24   A.    Could you repeat it?

25   Q.    Can I have it back, please?

1    THE COURT:  You can ask it again.

2    The question was, while he's been examining you

3  and after he showed you a document, you did agree -- and

4  that's the way he framed it, that on the day you passed

5  the information you played golf, is that your testimony?

6  A.    That's what the FBI wrote down.  That's not my

7  testimony.

8  Q.    And are you saying that --

9    THE COURT:  That's not your testimony.  Wait a

10  minute.

11    MR. MONAHAN:  No, I'm sorry.

12    THE COURT:  That's all right.  I just want to ask

13  a question.

14    What is your best memory about whether you played

15  golf on the day you passed the information?

16    THE WITNESS:  I remember playing golf on the 6th.

17  I don't know for sure if I passed the information on the

18  6th.  If you go back to that document you showed me from

19  the FBI, it says it could have been either the 6th or

20  the 13th, and I think it was the 13th, as I said

21  earlier, because I had a lot more to drink on the 13th

22  and I remember drinking a lot on the day I gave him the

23  tip.

24    THE COURT:  Go ahead, Mr. Monahan.

25  Q.    You'd agree with me, would you not, that according

1   to this document, that you told the FBI agent that you

2   gave the information --

3          MR. FRANK:  Objection, your Honor.

4   Q.     -- on the day you played golf?

5          MR. FRANK:  Objection.

6          THE COURT:  The objection is overruled.  He may

7   press the point.

8   A.     Again, Mr. Monahan, these are not my notes, it's

9   an FBI agent's notes.  I don't remember what I told

10  them.  I have never seen this document before.

11  Q.     Well, I'm asking you whether or not, according to

12  this document, in your statement to the FBI agent when

13  you told us you told the truth --

14         MR. FRANK:  Objection.

15         THE COURT:  The document's not in evidence, so

16  we're not interested in whatever it may say.

17         (Pause.)

18         MR. MONAHAN:  Could I offer this for

19  identification, Judge, at this point?

20         THE COURT:  It may be marked for identification.

21  We have nothing marked for identification?  Okay.  So

22  this will be A for Identification.

23         (Exhibit A, marked.)

24  Q.     When you sat down with the FBI agent, there were

25  what, two agents there?

1    A.    I don't remember.

2    Q.    Do you remember someone taking notes?

3    A.    (Silence.)

4    Q.    Do you remember when it was?

5    A.    (Pause.)   October 6th, 2014.

6    Q.    Do you remember sitting down?

7    A.    I'm not saying I remember that, I'm just looking

8    at the date on the document.

9    Q.    But you remember sitting down with an FBI agent,

10   correct?

11   A.    I remember sitting down with the Justice

12   Department and there could have been an FBI agent there.

13   Q.    And do you remember telling them what happened in

14   terms of your whole relationship with Mr. Bray?

15   A.    What are you referring to?

16   Q.    Telling them about your relationship with Mr. Bray

17   from the time you first met him until the present.

18   A.    Are you asking me to tell you what I told the FBI

19   agent that day?

20   Q.    No, do you remember telling them -- being asked

21   about your relationship with Mr. Bray and then answering

22   by telling the FIB agent basically everything that you

23   remembered about your relationship with Mr. Bray from

24   the time you met him up until that day?

25   A.    I don't really remember what I told him.

1    Q.    Well, you remember talking to him about the date

2    of the information?

3    A.    What date are you referring to?

4    Q.    The 6th or the 13th of June.

5    A.    That's what it says here, yes.

6    Q.    Do you remember telling him that?

7    A.    (Pause.)  That's what it says, "O'Neill believes

8    that he spoke to" --

9          MR. FRANK:  Objection.

10          THE COURT:  Wait.  Wait.  He's objecting to your

11    reading from it.  It's not in evidence.

12          THE WITNESS:  Oh, I'm sorry.

13          THE COURT:  So I'll sustain the objection.

14    Q.    Would it be fair to say that when you spoke to the

15    agent you told him that the day you gave the tip, for

16    lack of a better expression, was June 6th?

17          MR. FRANK:  Objection, asked and answered.

18          THE COURT:  Overruled.  He may press it.

19    A.    I don't remember.

20          THE COURT:  That's his answer.

21    Q.    And you've read this document, that part of it?

22    A.    That's the first time I've seen that document.

23    Q.    You read it right here?

24    A.    I read that one paragraph, yes.

25    Q.    And when you talked to the FBI agent, you told him

1    the truth, correct?

2    A.    I believe to have done that, yes.

3    Q.    Uh-huh.  And you were also asked, were you not, on

4    the date that you gave the tip, about the alcohol you

5    consumed and whether or not it affected your judgment?

6    A.    Are you asking me?

7    Q.    Yes.

8    A.    I don't remember.

9    Q.    Did you tell anyone, the agent or anyone else for

10   the government, that when you made the tip you felt you

11   made it because you had too much to drink, you normally

12   wouldn't have done that?

13   A.    I don't remember.

14   Q.    As a matter of fact, looking back on it now, would

15   it be a fair statement that if you hadn't had anything

16   to drink that day you probably wouldn't have said

17   anything about Wainwright Bank?

18   A.    That's your opinion.

19   Q.    Pardon me?

20   A.    Isn't that your opinion?

21   Q.    No, I'm just asking you.

22   A.    I don't know that to be true.

23   Q.    Well, you'd admit that both days you had a lot to

24   drink?

25   A.    I had more to drink on the 13th than on the 6th.

1  Q.    And you'd agree with me, would you not, that in

2  all likelihood you were at Oakley Country Club for at

3  least 3 hours both days?

4  A.    I don't know that to be true.  Based on those

5  time-stamps?  As I told you, those don't necessarily

6  mark how long you've been at the club.

7  Q.    Okay.  So what you're telling us is that the time-

8  stamps are not reliable in terms of determining when

9  someone may have left the club?

10  A.    That's what I'm telling you, they're not.

11  Q.    And the custom and practice is, is it not, that

12  when you leave the club -- well, at some point you check

13  out, especially when the pub room -- when you leave the

14  pub room there's a process by which the bartender stamps

15  the chit?

16  A.    As I told you earlier, I don't know that they

17  stamp the chit, but nobody signs for their chits up at

18  Oakley, they just leave, and they leave it up to the

19  bartender to tally them out at the end of the night,

20  which those time stamps are for.

21  Q.    So if chits were earlier in the day, say 5:11,

22  that's when the day was over?

23  A.    No, that's when the bartender timed them out.

24  Q.    Is that when a bartender changes shifts, is that

25  what you're telling us?

1    A.    I'm not saying that.

2    Q.    In any event, when you sat down on the day that

3    the information was given, you told us that Mr. Bray

4    asked you for a tip, a stock tip, correct?

5    A.    That's correct.

6    Q.    And you told us that he needed it because he was

7    building a project in Watertown, correct?

8    A.    That's correct.

9    Q.    And you and he talked for a while, you'll agree

10   with that, correct?

11   A.    I don't know how long we talked.

12   Q.    And prior to this you and Mr. Bray had discussed

13   bank stocks probably for the last several years,

14   correct?

15   A.    That's correct.

16   Q.    And you knew, did you not, that Mr. Bray

17   historically traded in bank stocks?

18   A.    He told me he had traded in bank stocks before,

19   yes.

20   Q.    And you believed him?

21   A.    There's no reason not to believe him.

22   Q.    And he appeared to be knowledgeable in bank

23   stocks, did he not?

24   A.    I didn't test his memory or his knowledge.

25   Q.    Well, based on your conversations with him, he

1    appeared to be somewhat knowledgeable in bank stocks,

2    correct?

3    A.    I don't know that to be true.

4    Q.    In your conversations with him, did you and he

5    discuss several banks other than Wainwright Bank?

6    A.    On what day are you talking about?

7    Q.    Whenever you gave this information to him, this

8    tip.

9    A.    We did.

10    Q.    Pardon me?

11    A.    We did.

12    Q.    Okay.  And would it be fair to say that what was

13    discussed were the banks in the local area that were

14    ripe for a takeover?

15    A.    I told him I liked certain banks in the area that

16    may be taken over.

17    Q.    And did you talk about the Belmont Savings Bank?

18    A.    I did.

19    Q.    And in your conversations with Belmont Savings

20    Bank, you and he had a discussion about what their

21    current status was, correct?

22    A.    I don't think we had that much of a detailed

23    discussion on Belmont Savings Bank.

24    Q.    Do you remember mentioning the name "Mahoney" to

25    Mr. Bray?

1   A.    I could have.

2   Q.    Okay.  And Mr. Mahoney was the President that was

3   brought in to take over the bank, correct?

4   A.    That's correct.

5   Q.    And the bank was going to go public and that's the

6   reason why he was brought in, correct?

7   A.    I don't know that to be true.

8   Q.    Did you have a conversation with Mr. Bray about

9   the actual status of the bank and it's -- whether it was

10  ripe for takeover?

11  A.    I could have.  I don't remember.

12  Q.    But you remember talking about other banks?

13  A.    I remember talking about other banks as well.

14  Q.    Do you remember talking about the Brookline

15  Savings Bank to him?

16  A.    I do.

17  Q.    Okay.  And do you remember talking about the

18  Webster Bank?

19  A.    I don't remember the Webster Bank being part of a

20  conversation.

21  Q.    Do you remember talking about the Boston Private

22  Bank?

23  A.    I do.

24  Q.    Okay.  And the Cambridge Savings Bank?

25  A.    I do.

1   Q.    Okay.  And these are all banks that you basically

2   gave him your expertise about what you thought the

3   prospects were for the future?

4   A.    I told him they were banks I liked which could

5   potentially be taken over or merged with another bank.

6   Q.    And the reason why you told him that was because

7   he discussed banks with you and was always looking for a

8   stock tip or a bank tip, correct?

9   A.    I don't know that to be true.

10  Q.    Well, he asked you for -- you and he discussed

11  bank tips for what, several years, 4 years, 5 years?

12  A.    I don't remember.

13  Q.    And when you usually got together with Mr. Bray

14  the custom is, is it not, that you would talk about not

15  only bank stocks, but everything else?

16  A.    Well, what do you define as "everything else"?

17  Q.    Well, family, um, social life, golf, current

18  events, the Red Sox, the Bruins, that sort of thing?

19  A.    That's a fair statement.

20  Q.    And you told us, I believe yesterday, that

21  Mr. Bray had a certain location in the bar?

22  A.    I did.

23  Q.    And this is the pub room at Oakley Country Club,

24  correct?

25  A.    That's correct.

1    Q.    And this room is a -- it's a big room, we saw a

2    picture of it yesterday with windows that overlook one

3    of the fairways?

4    A.    That's correct.

5    Q.    And there's also a porch outside the pub room,

6    correct?

7    A.    There is.

8    Q.    And you said that Mr. Bray stands in a corner?

9    A.    I didn't say he stands in a corner.

10   Q.    Oh, I'm sorry.  Did you tell us there's a certain

11   place where he goes when he usually goes in there?

12   A.    Typically he sits in the corner.

13   Q.    And usually there's a group of people around him,

14   correct?

15   A.    Sometimes.  Sometimes not.

16   Q.    You've seen him in there where he sits alone?

17   A.    Yes.

18   Q.    And so when he's in there he's just in the same

19   spot.

20         So on the day that you gave him the information,

21   do you remember walking over to him or him walking over

22   to you or anything like that?

23   A.    I remember he was sitting down and I walked over

24   to the bar, yes.

25   Q.    Okay.  Do you remember whether or not there were

1  other people with him?

2  A.    At that particular spot it was just he and I, but

3  there were other people in the bar, yes.

4  Q.    And the fact that you looked at the tabs for both

5  the 6th and the 13th and there were other people who had

6  bought -- who you bought for and also Mr. Bray bought

7  for, does that help you in terms of remembering whether

8  people were right around you talking or kibitzing about

9  local events or whatever?

10 A.    Yes or no, I mean I remember being alone with

11 Mr. Bray when the tip was given.  There were other

12 people in the bar, but not necessarily right around us.

13 Q.    So there was no one with you and he, correct, when

14 you gave him the tip?

15 A.    That's correct.

16 Q.    And you didn't just tell him the tip, you had to

17 write it down, correct?

18 A.    That's correct.

19 Q.    Did you feel that he was intoxicated and might not

20 remember?

21 A.    I don't remember.

22 Q.    Did you feel that you may have been somewhat

23 impaired?

24 A.    I don't remember.

25 Q.    Did you ever tell anyone that but for the alcohol

1   you drank that night you probably wouldn't have given

2   Mr. Bray that information?

3   A.    I don't remember.

4   Q.    (Pause.)  Did you ever tell Mr. Bray that you were

5   involved with due diligence at Wainwright Bank?

6   A.    I don't believe so.

7   Q.    So when you gave him the tip, this was after you

8   had discussed the other banks that we just mentioned?

9   A.    That's correct.

10  Q.    And you left and went home, correct?

11  A.    Yes.

12  Q.    Mr. Bray went home -- um, Mr. Bray remained there?

13  A.    I don't know what Mr. Bray did.

14  Q.    He remained there.

15        And so I believe you told us that in July you were

16  walking out of the club and Mr. Bray was walking in and

17  that he said, "Thanks for the tip, it went pretty well,"

18  something like that?

19  A.    No, that wasn't what I said.

20  Q.    What did Mr. Bray say to you?

21  A.    I was walking out with my wife and he was walking

22  in and he looked at me and he said, "Hey, Pat, I bought

23  that stock, I bought 20, 20-thou."

24  Q.    Did he say "Thanks"?

25  A.    Not at that point, he thanked me later.

1   Q.    So he bought 20,000 and that was it?  And what did

2   you say, if anything?

3   A.    I didn't say anything.

4   Q.    Do you remember talking to an FBI agent and

5   telling him what your thoughts were at that time?

6   A.    Again I didn't read that full document, so.

7   Q.    Do you remember telling someone, when you heard

8   that, that your thoughts were, "Oh, shit, he bought the

9   stock"?

10  A.    I don't remember.

11        MR. MONAHAN:  May I again, Judge?

12        THE COURT:  You may.

13  Q.    I'm going to show you what we talked about before

14  about your statement.  I'm going to ask you if you could

15  read this to yourself and tell us whether or not that

16  helps refresh your memory as to what you told the FBI

17  agent?

18  A.    Is this the same document that I hadn't seen

19  before?

20  Q.    Yes, it is.

21  A.    (Reads.)  Okay.

22  Q.    Does that help refresh you in terms of what you

23  thought when Mr. Bray told you he bought "20-thou"?

24  A.    That doesn't say he bought "20-thou" there.

25        THE COURT:  No, that's not his question.

1          The way I was taught it, you could show the

2    witness anything, you could show the witness a banana.

3    The question is, he's showing you a piece of paper, does

4    that jog your memory as to what you thought when

5    Mr. Bray said to you, as you've testified, "I bought

6    20-thou"?

7          THE WITNESS:  As I stated earlier, your Honor,

8    that that's what he said.

9          THE COURT:  Not what he said, what you thought

10   when he said that.  Does that refresh your recollection

11   as to what you thought when he said that?

12         THE WITNESS:  Well, I guess I'm a little confused,

13   your Honor, he did actually say --

14         THE COURT:  This question goes to what was going

15   through your mind and that you can say.

16         Did you think to yourself, "Oh, something, he went

17   and bought it?"  Did you?

18         THE WITNESS:  I believe I did.

19         THE COURT:  All right.

20         Go ahead, Mr. Monahan.

21   Q.    So when you gave him the tip, you hoped that he

22   wouldn't buy the stock, correct?

23   A.    (Silence.)

24   Q.    Is that a fair statement?

25   A.    It could be.

1  Q.    You signed this document, the document we talked

2  about, the U.S. Attorney talked about where you wouldn't

3  divulge any of the information you learned relative to

4  the due diligence you were doing regarding Eastern's

5  purchase of Wainwright Bank?

6  A.    It was a confidentiality agreement, yes.

7  Q.    Basically the information that you received was

8  "double-secret information," that's a fair statement,

9  correct?

10  A.    I don't think it says that in those exact words,

11  but I think the meaning is correct.

12  Q.    Well, that's my interpretation.  You agree with

13  it?

14  A.    Yes.

15  Q.    And so after -- you'd agree with me that after

16  several drinks you gave him this information and you

17  regretted giving it to him, correct, at this stage?

18  A.    I don't know that I regretted giving it to him at

19  that stage.

20  Q.    Well, you regretted giving it to him when you

21  said, "Oh, shit, he bought the stock"?

22  A.    That's not the same.

23  Q.    All right.  And so did you ever tell him, after

24  you left Oakley Country Club, call him and say, "Don't

25  buy the stock"?

1    A.    I did not.

2    Q.    And you had a lot of time to do that, did you not,

3    from June 6th or the 13th, whatever it is, until June

4    30th, correct?

5    A.    What is the June 30th?

6    Q.    To tell him not to buy the stock.

7    A.    I don't know when he traded, though.

8    Q.    Well, when you gave him the information, you had

9    an opportunity to tell him not to buy the stock and you

10   never told him that, correct?

11   A.    That's correct.

12   Q.    So then when you had the conversation with him, I

13   believe you told us it was in July, he told you that he

14   has some sort of a project he was going to deal you in

15   on?

16   A.    That's correct.

17   Q.    He never gave you anything as a result of this,

18   correct?

19   A.    No, he offered to bring me into his project.

20   Q.    Did he ever give you anything?

21         MR. FRANK:  Objection, the witness is --

22         THE COURT:  Wait a minute.

23         MR. MONAHAN:  I'm sorry, your Honor.

24         THE COURT:  The question is, "Did he ever give you

25   anything?"  And the witness may answer.

1  A.     He offered to bring me into his Watertown project.

2  The Watertown project never took off.

3  Q.     So it was a nothing, correct?

4  A.     No, there was an offer to bring me into his

5  Watertown project.

6  Q.     He told you it was a hotel, correct?

7  A.     That's correct.

8  Q.     There's no hotel there, correct?

9  A.     There's nothing there.

10  Q.     So the reality is he gave you nothing, correct?

11  A.     It was in the development stages.

12  Q.     Well, to this date it's still a blank piece of

13  land, correct?

14  A.     That's correct.

15  Q.     Now, you spoke with Mr. Bray in August also,

16  correct?

17  A.     I'm sorry?

18  Q.     You remember having a conversation with Mr. Bray,

19  as you told us, in August, after you had received the

20  FINRA document?

21  A.     That's correct.

22  Q.     And in terms of that conversation you told him

23  that you could lose your job?

24  A.     That's correct.

25  Q.     And you knew then, and you also knew when you gave

1    him the information, that you violated your duty,

2    correct?

3    A.    That's correct.

4    Q.    And there's no doubt here, in this court, that you

5    violated your duty to the public when you leaked out

6    that information?

7         MR. FRANK:  Objection.

8         THE COURT:  No, overruled.  He may be asked his

9    understanding.

10   A.    Well, I just said I did.

11   Q.    And as a matter of fact, that's the reason why you

12   pleaded guilty, correct?

13   A.    I pleaded guilty because I gave an illegal stock

14   tip.

15   Q.    You pleaded guilty because you were guilty,

16   correct?

17   A.    I was guilty.

18   Q.    And you're here testifying with the hopes and

19   expectations that you don't go to jail, correct?

20   A.    I don't want to go to jail.

21   Q.    It's your hope that you don't go to jail as long

22   as you cooperate, correct?

23   A.    All of my obligation here is to do, Mr. Monahan,

24   is to tell the truth, which I am doing.

25   Q.    And if you tell the truth to the satisfaction of

1   the government, you believe that you won't go to jail,

2   correct?

3   A.     That's not true.

4   Q.     Well, you're hoping you won't go to jail?

5   A.     Of course I'm hoping I won't go to jail.

6   Q.     Now, in terms of -- I believe you told us earlier

7   that -- yesterday your son Matthew, when he was 9 years

8   old, that Mr. Bray did him a favor in terms of cutting

9   down some golf clubs?

10  A.     That's correct.

11  Q.     And this probably would have been, um, correct me

12  if I'm wrong, 10 years before 2010?

13  A.     Well, I testified that he gave Matthew those clubs

14  when Matthew was about 9 or 10 years old.  Matthew's 25

15  today.  So 15 years prior to 2010.

16  Q.     And you told us that also that Mr. Bray was

17  generous with the other young members of the club,

18  correct?

19  A.     He was.

20  Q.     And his reputation at the bar at Oakley Country

21  Club is that he's generous with people there, correct?

22  A.     That's true.

23  Q.     And he has a nickname, as we heard yesterday, they

24  call him "the Bubba," correct?

25  A.     That's true.

1    Q.    Because he sits there and basically, no offense,

2    holds court?

3    A.    That's true.

4    Q.    And he usually has a following of people that kind

5    of sit around and are pretty much enamored by what he

6    has to say?

7    A.    I'd say that's a reasonable statement.

8    Q.    And he can regale you with a good story, correct?

9    A.    Yes.

10   Q.    And he's a good listener also, correct?

11   A.    I don't know that to be true.

12         (Laughter.)

13   Q.    He tends to control the conversation then with the

14   Bubba stories, correct?  Is that fair?

15   A.    I'm sorry?

16   Q.    Does he tend to control the conversation at the

17   table with Bubba stories?

18   A.    That's a fair statement.

19   Q.    All right.

20         Now, then you told us that, I think in 2009, many

21   years after the golf clubs were cut down, that he gave

22   your son a job and you were very grateful,

23   understandably so, that's what you told us, correct?

24   A.    He got my son a summer internship working for his

25   architect.

1    Q.    And the architect's name was Frank Coe, is that

2    correct?

3    A.    That's correct.

4    Q.    And would it be fair to say that what Mr. Bray did

5    was get his son an interview with Mr. Coe?

6    A.    I don't know if in fact he did interview with

7    Mr. Coe.

8    Q.    Well, it was a summer internship, correct, so he

9    helped him get the job?

10   A.    Yes.

11   Q.    All right.  And then you told us that at his

12   graduation Mr. Bray gave your son a check for $1,000,

13   whenever that was, in 2008?

14   A.    Well, whenever he got out of high school.

15   Q.    Do you remember when that was?

16   A.    (Silence.)

17   Q.    Well, it's --

18   A.    I mean he's 25.  He got out of high school when

19   he's say 13, so 13 from 25 is 12, so you do the math.

20   Q.    All right.  So in any event it was probably

21   several years before this information was -- the tip was

22   given, correct?

23   A.    Yes.

24   Q.    Okay.  And you told your son that he couldn't take

25   that and he ripped the check up, correct?

1    A.    Much to his display, yes.

2    Q.    Okay.  And you told him that it was just -- it was

3    just too much, it was too generous, correct?

4    A.    That's correct.

5    Q.    I think you ended up this morning -- you told us

6    that you, as a result of this, you lost your job at

7    Eastern Bank, correct?

8    A.    I lost two jobs, at Eastern Bank and then later on

9    at TD Bank.

10   Q.    And when did you start working at TD Bank?

11   A.    I lost the job at Eastern in September of 2010 and

12   I started working at TD Bank in March of 2011.

13   Q.    And how long did you work there?

14   A.    Almost four years.

15   Q.    Okay.  So you lost that job recently?

16   A.    Yes.

17   Q.    So --

18         MR. MONAHAN:  Excuse me, your Honor.

19         (Pause.)

20         THE COURT:  Have you got much more, Mr. Monahan?

21   I'm going to need a break before too much longer.

22         MR. MONAHAN:  Okay.  I've got a little bit more,

23   your Honor, if I may?

24         THE COURT:  Well, why don't we go for another 5 or

25   7 minutes.

1     MR. MONAHAN:  Well, that's the most I will need.

2     THE COURT:  That's fine.

3     (Pause.)

4     THE COURT:  Well, now, since we've interrupted

5  him, I'll ask that juror question.

6     In your interaction with Mr. Bray where you've

7  testified you wrote the name "Wainwright" on a napkin,

8  slid it over to him --

9     THE WITNESS:  Yes.

10     THE COURT:  -- what if anything did you say about

11  Eastern Bank, your employer's involvement, if any, in

12  the acquisition, sale, due diligence, anything at all

13  having to do with Wainwright?

14     THE WITNESS:  I did not say anything about Eastern

15  Bank.

16     THE COURT:  Nothing about Eastern Bank?

17     THE WITNESS:  No.

18     THE COURT:  Had the name "Wainwright" come up in

19  your conversation prior to that time?

20     THE WITNESS:  Um, I don't believe so.

21     THE COURT:  Okay.

22     You go ahead, Mr. Monahan.

23  Q.     In light of that, what you told Bray was -- in

24  terms of Wainwright, "This could be a good one,"

25  correct?

1    A.    That's correct.

2    Q.    Okay.  And that's when you handed him the note?

3    A.    I handed him a napkin.

4    Q.    The napkin.

5    A.    We had talked about a number of bank stocks

6    beforehand, I testified Cambridge Savings, Brookline

7    Savings, Belmont Savings, and the Boston Private, those

8    were all discussed in the normal course of the

9    conversation.  "Wainwright" was not mentioned in that

10   conversation.  I then took a pencil, wrote the word

11   "Wainwright" on a napkin, and slid it over to him.  He

12   must have known that that was an unusual thing to do.

13   Q.    Well, you said, "This could be a good one,"

14   correct?

15   A.    I did say "This could be a good one."

16   Q.    In your conversations with Bray about the banks,

17   whether it was that day or earlier days, did you and he

18   talk about TARP money?

19   A.    About what?

20   Q.    TARP money.

21   A.    T-A-R-P money?

22   Q.    Yes.

23   A.    Not that I remember.

24   Q.    TARP money is for the "Trouble Asset Recovery

25   Program"?

1    A.    That's correct.

2    Q.    And you do not have a memory of talking about

3    those banks with Mr. Bray?

4    A.    No, the banks that took TARP money were Bank of

5    America, Goldman Sachs, all the bigger banks in the

6    country.  I don't remember having that conversation.

7    Q.    Do you know whether or not Wainwright took TARP

8    money?

9    A.    I don't believe they did, but I don't know.

10   Q.    You're familiar with the "Boston Business

11   Journal," correct?

12   A.    I am.

13   Q.    And are you aware whether or not the Boston

14   Business Journal actually published the names of banks

15   that took TARP money?

16   A.    I mean if you're saying it did, then maybe it did.

17   I didn't see the article.

18   Q.    But there were newspaper articles out there that

19   detailed which banks took TARP money?

20   A.    If you say so.

21   Q.    Well, isn't that a fact?

22   A.    I don't know that to be a fact.  I'm sure there

23   were newspaper articles on it, yes, but I don't know

24   which newspapers.

25         THE COURT:  This is a good example of how

1    interrogation works.

2         It's perfectly appropriate for Mr. Monahan on

3    cross-examination to pose questions to the witness which

4    suggest things and this is one of those situations,

5    "Well, there were articles and the articles said this

6    and that and you knew thus and so," that's an

7    appropriate way to pose questions, but the testimony is

8    the testimony of the witness and the witness says he

9    didn't read any such articles.  You can believe it, you

10   can disbelieve it, you can believe parts of it.  That's

11   the testimony.  But the back and forth is not evidence

12   that there were any such articles.  It's okay for the

13   lawyer to suggest that, but it's not evidence of it

14   until the witness affirms it, then it's up to you what

15   you believe.

16        Go ahead, Mr. Monahan.

17        (Pause.)

18        MR. MONAHAN:  May I approach the witness again,

19   Judge?

20        THE COURT:  You may.

21        (Pause.)

22        MR. MONAHAN:  That's all I have, Judge.

23        THE COURT:  All right.  Any redirect?

24        MR. FRANK:  Very brief, your Honor.

25        THE COURT:  "Very brief."  On that representation,

1  go ahead.

2       (Laughter.)

3       MR. FRANK:  I've learned my lesson.

4       THE COURT:  Well, I'm not crowding you, but we're

5  all going to need a break.

6       (Pause.)

7       MR. FRANK:  I need a moment to get organized,

8  Judge, is it possible we can take our break and then --

9       THE COURT:  Oh, why don't you get organized and

10  then the very brief redirect.

11       MR. FRANK:  Okay.

12       (Pause.)

13

14  REDIRECT EXAMINATION BY MR. FRANK:

15  Q.    Sir, you were asked some questions about other

16  banks that you mentioned to the defendant?

17  A.    Yes.

18  Q.    Did he ever thank you for the information you

19  provided about Belmont Savings?

20  A.    Not that I remember, no.

21  Q.    Did he ever thank you for the information you

22  provided about Boston Private?

23  A.    No.

24  Q.    Did he ever thank you for the information you

25  provided about Cambridge Savings?

1    A.    No.

2    Q.    Did he ever thank you for the information you

3    provided about any bank other than Wainwright Bank?

4    A.    No.

5    Q.    But he did thank you for the information you

6    provided about Wainwright?

7    A.    He did.

8    Q.    When Mr. Bray had asked you about stocks prior to

9    June of 2010, had you ever before written the name of a

10   particular stock on a napkin?

11   A.    Never.

12   Q.    Had you ever written it on anything?

13   A.    No.

14   Q.    When you passed Mr. Bray the napkin, did he ask

15   you what you were doing?

16   A.    No.

17   Q.    Did he ask you any questions about what was on the

18   napkin?

19         MR. MONAHAN:   Objection.

20         THE COURT:   Yeah, sustained, you're leading the

21   witness.   You may ask him what happened.

22   Q.    What if anything did he ask you about what was on

23   the napkin?

24   A.    He did not ask me anything, he simply took it,

25   folded it up, and put it in his pocket.

1   Q.    When you passed the napkin to Mr. Bray, what was

2   your expectation of what he would be doing with that

3   information?

4         MR. MONAHAN:  Objection.

5         THE COURT:  No, in the circumstances he may have

6   what was going on in his mind.

7         What did you expect?

8   A.    I expected that he would act upon it and trade the

9   stock.

10        (Pause.)

11        MR. FRANK:  Nothing further, your Honor.

12        THE COURT:  Nothing further, Mr. Monahan?

13        MR. MONAHAN:  One, if I may?

14        THE COURT:  You may.

15

16  RECROSS-EXAMINATION BY MR. MONAHAN:

17  Q.    Well, when you found out that he traded the stock,

18  you told us your reaction was "Oh, shit, he traded the

19  stock," didn't you just tell us that?

20  A.    No, I don't think I said that.

21  Q.    Didn't you say, "Oh, shit, he traded the stock"?

22  A.    That's what the FIB notes say.

23  Q.    Didn't you say that you thought that, on the

24  witness stand right here a few minutes ago?

25  A.    I don't remember.

1         MR. MONAHAN:  That's all I have.

2         THE COURT:  Nothing further?

3

4    REREDIRECT EXAMINATION BY MR. FRANK:

5    Q.    Were you upset when the day came and you found out

6    how much he had actually traded?

7         MR. MONAHAN:  Objection.

8         THE COURT:  Sustained.  Beyond the scope.

9         MR. FRANK:  Nothing further.

10        THE COURT:  All right.  You may step down.  Thank

11   you.

12        (Witness steps down.)

13        THE COURT:  Now we'll take a recess.  We started a

14   little late, so we'll take a recess for about 20

15   minutes.  We'll stand in recess until a little bit after

16   -- a little bit after a quarter after 11:00.  I have not

17   heard all the evidence.  This is not the only witness.

18        Keep your minds suspended, do not discuss the case

19   either among yourselves nor with anyone else.  The jury

20   may stand in recess for 20 minutes.  The jury is in

21   recess.

22        (Jury leaves, 11:00 a.m.)

23        (Recess, 11:00 a.m.)

24        (*EXCERPT* ends.)

25