# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

JOHN PATRICK O'NEILL,

     Defendant.

**Criminal No. 14-10317-WGY**

## SENTENCING MEMORANDUM OF JOHN PATRICK O'NEILL

Defendant John Patrick (Pat) O'Neill agrees with the Government's sentencing

recommendation, and requests that this Court sentence him to no more than one year probation

and no fine.  The Government's § 5K1.1 motion and memorandum ("Gov't Mem.") articulate

several of the manifold reasons that support a relatively lenient sentence for Mr. O'Neill.  These

reasons include:

- *O'Neill's History and Personal Characteristics* – The Government's memorandum, the PSR, and the 31 letters of support for Mr. O'Neill that have been submitted by friends, family, and business colleagues (*see* Appendix of Letters in Support of John Patrick O'Neill ("App.") filed together with this memorandum) all make clear that Pat O'Neill is a man of integrity and character. As the Government observes, Mr. O'Neill's involvement in the crime to which he pled guilty "was, quite literally, a momentary aberration in an otherwise unimpeachable life."  Gov't Mem. at 9.

- *Absence of Any Tangible Benefit* – Mr. O'Neill received no monetary or tangible benefit whatsoever from his momentary, albeit criminal, lapse in judgment.  He stands convicted of conspiracy to engage in insider trading.  But he never engaged in insider trading himself, and received no monetary or tangible benefit from anyone else's trading.  The very second he gave Robert Bray a secret stock tip, he regretted what he had done.  He effectively exited the conspiracy within a second of having entered it, and he later affirmatively rejected offers from Mr. Bray of financial benefit.  It is no wonder that in Mr. Bray's trial, the jury found Mr. Bray guilty of insider trading, but not guilty of a conspiracy with Mr. O'Neill.

- *Severe Financial Punishment to Date* – Although he received no real benefit for his wrongdoing, Mr. O'Neill has already been severely punished.  He has lost two

jobs and lost nearly his entire expected pension.  He has been unemployed since August 2014, a period of almost 21 full months.  The combination of lost future earnings and legal fees have cost Mr. O'Neill in excess of $2.5 Million, and thrown his family into debt.  Plus, his conviction stands as a legal bar to future employment in banking, the profession he proudly served for over three decades.  In a word, his conviction has been a career death sentence.

- *Severe Emotional Punishment* – If anything, the emotional toll Mr. O'Neill's wrongdoing has had on him and his family has been even more severe than the employment and financial penalties.  Within days of Mr. O'Neill's June 2010 wrongdoing ███████████████████████  He continues, six years later, ██████████████████████████████████s.  His letters of support speak sadly of his transformation from a happy, confident and gregarious person into a depressed and ashamed shell of his former self.

- *Future Punishment* – Independent of the sentence Mr. O'Neill receives from this Court, he will receive additional sanctions and punishments from both the Securities and Exchange Commission ("SEC") and the Federal Deposit Insurance Corporation ("FDIC").  Litigation initiated by the SEC and an administrative enforcement investigation commenced by the FDIC have both been effectively stayed pending the outcome of Mr. O'Neill's criminal case.  But both agencies have informed undersigned counsel that they expect to impose sanctions on Mr. O'Neill, including formally barring him from any future employment in any FDIC-insured institution, and monetary fines.  Counsel has been informed that at least in theory, Mr. O'Neill's SEC monetary exposure is in excess of $1,255,000, and his FDIC monetary exposure could be as high as $15,000.

- *Remorse* – As the Government makes clear, Mr. O'Neill's remorse has been profound, deep and genuine, starting the very moment he illegally passed a stock tip to Robert Bray and continuing to the present.  *See, e.g.*, Gov't Mem. at 9-10.  Unlike many criminal defendants who opportunistically express remorse and accept responsibility for their crimes to cut a better deal for themselves, Mr. O'Neill's remorse and acceptance of responsibility have occurred because his criminal conduct (which lasted all of a few seconds) ran counter to every moral fiber of his being.  He has been beating himself up for the past six years over what he did, not because he's looking for a lenient sentence, but because he knows what he did was wrong.

- *Cooperation and Substantial Assistance* – Promptly after his arrest in August 2014, Mr. O'Neill began cooperating with the government.  He did so not because he wanted to help himself or hurt his friend Robert Bray, but because of a profound sense of guilt, and a desire to have the truth come out.  As the Government has explained, Mr. O'Neill's cooperation was full and candid.  He held nothing back.  He provided "unique insight" into the facts of the case, and his cooperation, including testimony at trial, was "critical" in the Government's prosecution of Mr. Bray.  *See* Gov't Mem at 2, 5-7.  Securities fraud is a serious

ACTIVE/85860631.1

crime that is notoriously difficult to detect. As the Government aptly states: "Without cooperators like O'Neill, those responsible for such frauds all too often go uncharged, and unpunished. Such cooperation must be recognized in imposing sentence." *Id*. at 13.

Even without the substantial assistance and cooperation Mr. O'Neill provided to the Government, he would be deserving of no more than a probationary sentence. The punishment he has already received, self-imposed and otherwise, including the 21 months he has been on probation in the form of pre-trial conditions of release since his arrest on August 18, 2014, is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing as set forth in 18 U.S.C. § 3553(a)(2). In light of the seriousness of the offense to which Mr. O'Neill pled guilty, momentary though Mr. O'Neill's criminal behavior may have been, Mr. O'Neill recognizes the legitimacy of the Government's request for a sentence of one year probation. But even that is not necessary to achieve the goals of sentencing.

## 1. The History and Characteristics of John Patrick O'Neill, 18 U.S.C. § 3553(a)(1)

### A. O'Neill's Background

The words most often used to describe Pat O'Neill by those who know him best are: "integrity," "honesty," "generosity," "kind," "gentle," and "humble." *See generally* App. at Exs. 1-31. Mr. O'Neill is a good, honorable man who had a momentary lapse in judgment that has turned his life inside out, and led directly to his conviction. He is a 66 year old man, who, with the exception of the crime that has brought him before this Court, has had an unblemished history of good deeds and achievement. As the Government has noted, Mr. O'Neill's crime started and ended in the blink of an eye, and stands in stark contrast to his "otherwise unimpeachable life." Gov't Mem. at 9. The word "aberration" is sometimes overused to describe the wrongdoing of criminal defendants. But not so in the case of Pat O'Neill. His crime was the very definition of an aberration.

Mr. O'Neill is the youngest of seven children, born to poor, hard-working parents in

Lowell, Massachusetts.  App. at Ex. 4.  Mr. O'Neill's father, who had worked as a custodian at

Lowell Technical Institute, died when Mr. O'Neill was 16 years old.  PSR at ¶¶ 51-52.  As Mr.

O'Neill's oldest brother, Charles "Ted" O'Neill, explains:

> Our father died of cancer when Pat and his twin sister Maura were
> freshman in high school.  Before he died, our Dad worked three
> jobs, one full time and two part time, and our Mom worked nights
> 11 to 7 AM for many of our childhood years at a woolen mill in
> Lowell before she was able to switch to working days.  This split
> schedule gave us our Dad nights and our Mom days but not much
> time all together as a family.  We seven saw and appreciated to our
> core how hard our parents worked to provide for us.  In return, all
> of us worked almost as hard as they did in thanks for their
> extraordinary care and support and their pride in us. A large piece
> of Pat's broken heart over his crime comes from feeling that he
> failed to honor that sacred sense of gratitude that binds us all to our
> parents.

App. at Ex. 4.  Notably, with the exception of his momentary lapse, Mr. O'Neill has honored

what his brother terms "that sacred sense of gratitude" in everything he has done throughout his

life.

## B.  O'Neill's Military and Employment History

Mr. O'Neill served the United States in the Coast Guard from 1968 – 1974, including

five months of active duty, receiving an honorable discharge in February 1974.  PSR at ¶ 77.  He

attended U. Mass. Lowell and graduated with a degree in accounting in 1975.  *Id*. at ¶ 76.  And

one year later he obtained an MBA from U. Mass. Amherst.  *Id.*  For over 30 years he worked in

banking and finance, principally as a mortgage banker, for an array of financial institutions,

including Bank of New England, Fleet Management, Citizens Bank, Lehman Brothers, Winmark

Leasing, and others.  *See, e.g., id.* at ¶¶ 78-85.  He was always a diligent employee, with a work-

ethic second to none.  *See, e.g.,* App. at Exs. 1-31.  And his hard work did not go unrewarded.

He rose to managerial positions, and at every step of his career he performed with distinction,

ACTIVE/85860631.1

earning the respect, friendship and admiration of superiors and peers alike. *Id.* At no time, did

he ever break the law or breach any obligation he owed to any employer. *See* Gov't Mem. at 9.

With the exception of the incident that landed him before this Court, Mr. O'Neill's professional

career has been one of distinction.

### C.  O'Neill's Commitment to Church, Community and Family

Successful as he was in his professional career, Mr. O'Neill's life has always been

defined more by church, community, and family than by work. *See, e.g.*, App. at Exs. 1-4, 8-9,

and 12.   He is a god-fearing man of deep faith who attends the St. Joseph's Catholic Church in

Belmont regularly. *See, e.g., id.* at Exs. 17 and 27.   And he is an active member of the Belmont

community where he has lived since 1993. *See, e.g. id.* at Ex. 11.   But family is what has

always counted the most for Mr. O'Neill. *Id.* at Exs. 1-9.   His greatest and proudest

achievements are his marriage of 30 years to his wife, Sharon, and their three children, Sean (age

27), Matthew (age 25), and Kara (age 22), all of whom are college graduates. *Id.* Mr. O'Neill

adores his wife and kids, and that adoration is clearly returned in kind.   For instance, Kara

regards him as the "best Dad in the world," who has "done nothing but support [her] dreams and

aspirations over the years, all the while providing endless amounts of love and dedication as a

father." *Id.* at Ex. 5.   Matthew (who testified before the Court in Mr. Bray's trial) "attribute[s]

most if not all of the commendable qualities [he] may have to" his father. *Id.* at Ex. 6.

Mr. O'Neill also remains very close to his five older siblings, and his twin sister, Maura,

who is now suffering from early onset Alzheimer's. *Id.* at Ex. 12.   They and many others all

attest to Mr. O'Neill's generosity and how he "lives to help people," always puts others first, and

routinely goes out of his way to help those most in need, whether they are young, shy caddies at

a golf club (App. at Ex. 21) or a nephew wounded at war in Afghanistan (*id.* at Ex. 2), or, most

recently, his twin sister, whom he makes it a point to take out to lunch every week (*id.*).

Ironically, and tragically for Mr. O'Neill, it may well have been his innate selflessness and desire

to help others, that led him, in a moment of weakness, to pass a stock tip to a friend who was

pressing him and expressing the need to make "a big score."  Unlike Mr. O'Neill's many other

acts of kindness and generosity, that decision is one Mr. O'Neill has regretted every day for the

past six years.

### D.  <u>The Emotional Effects of the Crime On O'Neill</u>

Thirty-one letters of support have been submitted on behalf of Mr. O'Neill.  Notably,

even though each of the letters was written wholly independently of all the others, they all

describe the same man of genuine grace and goodness.  All of the letters also note how out of

character, and inconsistent with his life and values, Mr. O'Neill's crime was.  *See, e.g.,* App. at

Exs. 13 and 14.  To a person, family members, friends and business colleagues, have expressed

shock that Pat O'Neill, who is as honest and ethical and moral a person as they know, would

have breached any obligation, let alone committed a federal crime.  *See, e.g., id.*  And all have

observed first-hand how Mr. O'Neill's crime, and the investigation and charges that have

followed, have affected him, and transformed him from a sociable, gregarious person into a

"shell of his former self."  *See, e.g., id.* at Exs. 1-9.

Mr. O'Neill's crime lasted an instant, but he has lived with the shame it has caused every

minute of the past six years.  The transformation it has wrought in him is obvious to everyone

who knows him.  *See generally id.* at Exs. 1-31.  They describe the confident, happy man they

once knew as someone who no longer smiles and is emotionally fragile.  Today's Pat O'Neill is

described by his loved ones as "contrite," "damaged," "dispirited," "melancholy," "in pain,"

"broken-hearted," "grieving," "devastated," and "shamed."  Indeed, so obvious is the

transformation, that even Mr. O'Neill's twin sister who is in a state of dementia and to whom the family has said nothing about her brother's predicament, has observed the change in her brother. As Maura's best friend, Priscilla Fawcett, who has known Pat and Maura for over 50 years writes (*see* App. at Ex. 11):

> Pat's admission of guilt in this egregious affair is testimony to his integrity and character.  He has never shirked his responsibility in any situation.  He served his country in the Coast Guard during the Vietnam Era and has worked diligently to build a life for himself and his loving family.  His twin sister, Maura, my dearest friend, suffers from early onset Alzheimer's disease and Pat is involved significantly in her care.  Maura knows nothing of this issue, yet repeatedly tells me she is worried about her twin because he is a "nervous wreck."  Even she in her dementia can perceive the toll this has taken on him.  It will be devastating to her if he is gone from her life.

The pain and remorse Mr. O'Neill feels for what he did is genuine and raw.  He has been



███████████████████████████████████████████████████████ PSR at

¶¶ 67 and 73. ████████████████████████████████████████████

███████████████████████████████████████████████████ *Id.*

at ¶ 73.  So shamed is Mr. O'Neill of his crime and the effect it has had on his family, that

notwithstanding the love, affection, and support he has received from so many, ████████

████████████████████████████████████████████████████████

██████ *Id.* at ¶¶ 67 and 73; *see also, e.g.,* App. Exs. 3,4 and 8.  ████████████

████████████████████████████████

### E.  <u>The Financial Effects, Current and Future, of the Crime On O'Neill</u>

The transformation of Mr. O'Neill's financial condition and financial prospects have

been nearly as dramatic and bleak as the change in his emotional well-being.  And as with his

emotional decline, the financial decline is directly attributable to the stock tip Mr. O'Neill gave

to Mr. Bray, a tip for which he earned nothing but regret and remorse.

The day Mr. O'Neill gave Mr. Bray the tip, Mr. O'Neill was employed in an executive position at Eastern Bank, earning a salary of $185,000 per year. His position also brought with it a lucrative pension plan and stock options, which would have resulted in gross income of between $1,500,000 and $2,000,000 over the next five years. On that day in June 2010, Mr. O'Neill was 60 years old, and very much looking forward to a comfortable retirement at the age of 65. Two months later, rather than lie in response to a routine FINRA questionnaire about trading in Wainwright stock, Mr. O'Neill resigned his lucrative job, and forfeited all of the benefits that came with it. Gov't Mem. at 1-2. He likewise gave up the financial security and the promise of a comfortable retirement that came with his position at Eastern.

Today, in stark contrast to June 2010, Mr. O'Neill is unemployed, and has been unemployed since August 2014. He wants, indeed needs, to work, but ████████████ ███████████████████████████████████████████████████████ ████ his guilty plea to a felony, have made it effectively impossible for him to find work. Far from enjoying retirement, Mr. O'Neill, now 66 years old, finds himself with mounting debt and bleak prospects of ever being able to retire at all.

Over the past several years, while Mr. O'Neill has been unemployed, he and his wife have gotten by on his wife's relatively modest income, which has been supplemented by Mr. O'Neill eating into his 401k retirement savings accounts in order to pay legal expenses and mortgage debt. To the extent Mr. and Mrs. O'Neill's joint gross "income" as reported on their tax returns has remained steady or even grown over the past several years (see PSR at ¶ 83), that is because all amounts that Mr. O'Neill has withdrawn from his 401k savings (a total of $147,000), as well as ███████████████ restricted stock unit ("RSU") payments Mr. O'Neill has received from TD Bank (the company for which he worked from 2011 until his

arrest in August 2014) have counted for tax purposes as "income."  But ███████████

will end no later than February 2017, and there will be no further RSU payments after 2016.  In

other words, going forward, without further eating into his and his wife's dwindling retirement

savings, the O'Neills, whose monthly debts already surpass their monthly income, will not be

able to make ends meet.

     In determining whether or not Mr. O'Neill should pay a fine as part of his sentence, Mr.

O'Neill requests that the Court consider his declining financial circumstances.  See, e.g., PSR at

¶¶ 87-98.  Mr. O'Neill estimates that the combination of the legal fees he has incurred since 2010

as well as the wages and benefits he forfeited when he resigned from Eastern Bank (even as

offset by his later income and benefits from TD Bank ███████████████████

███████████████ total at least $2,500,000 in lost money.  In addition, we request that

the Court consider the fact that Mr. O'Neill has no prospect of future employment in his chosen

profession.  In fact, by operation of law he is barred for life from ever again working for an

FDIC-insured financial institution (unless he receives a waiver from the FDIC, which FDIC

counsel has told undersigned counsel never occurs under circumstances like those present here).

See 12 U.S.C. § 1829.  And lest there be any doubt, FDIC counsel has indicated that the current

intent of the FDIC is to obtain a formal, public order under 12 U.S.C. § 1818(e) prohibiting Mr.

O'Neill from ever again working for an FDIC affiliated institution.  In other words, Mr.

O'Neill's conviction in this matter is a career death sentence.

     Mr. O'Neill also requests that in meting out just punishment, the Court consider that the

FDIC has indicated that in addition to barring Mr. O'Neill from ever again working for an FDIC

affiliated institution, it may seek to fine Mr. O'Neill up to $15,000 under 12 U.S.C. § 1818(i).

Furthermore, we ask the Court to consider the fact that the SEC has brought a parallel civil case

against Mr. O'Neill, which is pending before Judge Burroughs, and in connection with which Mr. O'Neill faces the prospect of having to pay a substantial monetary fine. *See Securities and Exchange Commission v. J. Patrick O'Neill and Robert H. Bray*, Case No. 14-cv-13381-ADB. Mr. O'Neill certainly hopes to resolve the SEC matter without having to pay any fine. But SEC counsel has informed Mr. O'Neill that unless and until there is a settlement, and in light of Mr. Bray's stated intention of appealing the sentence imposed on him by this Court, Mr. O'Neill faces exposure in excess of $1,255,000 ($300,000 disgorgement of Mr. Bray's gain plus a three times penalty of $900,000, plus prejudgment interest which by the SEC's calculation was in excess of $55,000 as of Monday, May 9, 2016). Realistically, Mr. O'Neill's exposure in the context of an anticipated settlement or other resolution with the SEC would be no higher than $300,000, which obviously is still a lot of money, and particularly a lot for a person of Mr. O'Neill's age and dwindling financial means and job prospects. And, it should not be forgotten, that all of this exposure is in a case in which Mr. O'Neill himself never traded in Wainwright stock, and never received even a penny in benefit.

## 2.  <u>The Nature and Circumstances of the Offense</u>

The Court heard the evidence regarding the nature and circumstances of the offense at Mr. Bray's trial. There is no reason to repeat any of that evidence here. Likewise, there is no reason to debate whether or not insider trading or conspiracy to commit insider trading is a serious crime. Both are. And there is no reason to quarrel over whether insider trading is a victimless crime. Where, as in the case of Bray, actual insider trading occurs, there is no question there are real individual victims (*e.g.*, those who, in this case, sold Wainwright stock to Bray without the benefit of the inside information Bray had). In addition, here as in any securities fraud case in which insider trading occurs, the openness and transparency upon which

ACTIVE/85860631.1

our securities markets rely are undercut and compromised.  Still, in connection with sentencing, a number of facts concerning Mr. O'Neill's role in the offense bear noting, because we believe they mitigate Mr. O'Neill's culpability, and distinguish his involvement in the charged conspiracy and its aftermath from that of Mr. Bray, his co-conspirator.

First, Mr. O'Neill, in sharp distinction from Mr. Bray, obtained no monetary or other tangible benefit whatsoever from the insider trading that occurred.  Mr. Bray traded over and over and over again, and profited to the tune of about $300,000.  Mr. O'Neill did not trade at all, and did not receive any actual monetary or tangible benefit from Mr. Bray's trades.  No kickback.  No payment of any sort.  No nothing.  Indeed, when Mr. Bray, after the fact, twice offered Mr. O'Neill a tangible benefit – namely, an interest in Mr. Bray's Watertown development project – as a thank you for the tip Mr. O'Neill had provided, Mr. O'Neill declined the offers.

Second, on the issue of intent, although Mr. O'Neill (i) knew that the giving of the tip to Mr. Bray was a breach of the duty of confidentiality he owed to Eastern Bank, (ii) knew what he was doing was wrong, (iii) expected that Mr. Bray would trade on the information, and (iv) expected that the tip would enhance his friendship with Mr. Bray and result in some form of further benefit from Mr. Bray down the road, at the time of the trade there was no tangible or specific quid pro quo that Mr. O'Neill had in mind.  By mentioning all this, we do not mean to suggest that a tangible or specific quid pro quo is necessarily required for tipper liability.  Nor do we intend to diminish Mr. O'Neill's acceptance of full responsibility for his wrongdoing.  Rather, we note these facts, because there is uncertainty in the law, and at least Mr. Bray, through counsel, has suggested that something more objective and consequential than Mr. O'Neill's expectations is required for tipper or tippee liability under 18 U.S.C. § 371, sections

ACTIVE/85860631.1

10(b) and 32 of the Securities Exchange Act of 1934, and/or SEC Rules 10b-5 and 10b5-2.[1]  Mr. O'Neill does not seek to benefit from this uncertainty, but it would seem significant – and an indication of Mr. O'Neill's deep and genuine acceptance of responsibility – that he pled guilty, and has not sought to vacate his plea, in the face of the uncertainty.

Third, and perhaps most importantly, Mr. O'Neill's involvement in the charged conspiracy was momentary.  It started and finished in a flash.  As the Government has observed, Mr. O'Neill's "decision to pass Bray a napkin containing an illegal stock tip . . . happened in an instant. . . . O'Neill's crime was completed the moment he passed the tip."  Gov't Mem. at 9. Mr. O'Neill had been drinking beer and discussing publicly available information as Mr. Bray hounded him for a stock tip.  Eventually, having had too much to drink, and in a moment of weakness, Mr. O'Neill gave in to Mr. Bray, wrote the word "Wainwright" on a napkin, and slid the napkin across the bar to Mr. Bray, stating in words or substance that "this could be a good one."  As the government observes, Mr. O'Neill's conduct was "knowing, voluntary, willful and criminal," but it also "happened in an instant."  *Id.*  It happened and as soon as it happened, it ended.  Mr. O'Neill did nothing to further the wrongdoing.  When offered the opportunity to profit from Mr. Bray's trades, he declined.  And he resigned his lucrative position at Eastern, rather than lie to regulators to protect himself.  *Id.* at 1-2.

Mr. O'Neill effectively exited the conspiracy the very second it started.  Rather than take advantage of the conspiracy or gain any benefit from it, he went home and expressed regret over his terrible lapse in judgment.  Whether calling Mr. Bray or otherwise taking steps to try to

---

[1] *See, e.g., United States v. Newman and Chiasson*, 773 F.3d 438, 450, 452 (2d Cir. 2014) ("a breach of the duty of confidentiality is not fraudulent unless the tipper acts for personal benefit, that is to say, there is no breach unless the tipper 'is in effect selling the information to its recipient for cash, reciprocal information, or other things of value for himself'"; there can be no tipper or tippee liability "in the absence of proof of a meaningfully close personal relationship [between tipper and tippee] that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature. . . . in order to form the basis for a fraudulent breach, the personal benefit received in exchange for confidential information must be of some consequence.").

prevent Mr. Bray from trading on the tip would have made any difference, we will never know. Mr. O'Neill did not take any such steps, but, as the Government points out, "neither did he take any additional steps to further the crime."  Gov't Mem. at 9.  Mr. O'Neill expected that Mr. Bray would purchase Wainwright stock, but he had no idea when or how much Mr. Bray purchased, that is, he had no idea until Mr. Bray told him.  At the point that Mr. O'Neill learned the amount Mr. Bray had purchased, he was shocked and shaken.  But rather than lie about the trades, and try to hide what had occurred, he resigned his position at Eastern Bank.  In other words, he behaved like the regretful, remorseful person he is, and not like a conspirator.

Mr. Bray's decision to purchase Wainwright stock based on confidential, insider information was anything but aberrant.  Rather, it was intentional, even gleeful, and it was repeated over and over again during the weeks following the tip.  In contrast, Mr. O'Neill's decisions not to purchase any Wainwright stock, to decline Mr. Bray's offers of benefit, and to resign from Eastern rather than lie on the FINRA form, all speak to just how aberrant the giving of the tip was to who Mr. O'Neill is and has always been.

In fact, the contrast between Mr. O'Neill and Mr. Bray may best be illustrated by the different ways in which each responded to the FINRA inquiry.  Mr. O'Neill was panicked and concerned.  He confronted Mr. Bray with the FINRA letter at the Oakley Country Club, and after speaking with Mr. Bray, he left the club trembling, made his way home, and soon thereafter resigned from Eastern rather than lie.  Mr. Bray viewed the FINRA letter as a joke.  He was not concerned in the slightest.  He told Mr. O'Neill not to worry, because he would lie to the regulators, and have them wishing they had purchased Wainwright stock.  He expressed no empathy for Mr. O'Neill and no concern about the predicament created for Mr. O'Neill by the

ACTIVE/85860631.1

FINRA letter.  As Mr. O'Neill left trembling, Mr. Bray returned to playing cards with his buddies.

Throughout the ordeal of the investigation, indictment, trial and sentencing, Mr. O'Neill's and Mr. Bray's conduct and attitude have been diametric opposites.  O'Neill has been humble. Bray has been arrogant. O'Neill has been self-effacing.  Bray self-aggrandizing. O'Neill has been full of remorse.  Bray has been proud of himself, and has never expressed a smidgeon of remorse. As far as anyone can tell, he is remorse-free.  O'Neill refused to lie, even when doing so would have saved his job, and likely put a kibosh on the investigation.  Instead, he resigned from Eastern, and in the process created emotional and financial hardship for himself and his family.  Bray not only prepared to lie, but when given the opportunity to respond to SEC interrogatories, he lied rather than tell the truth about his trading.  Indeed, he lied rather than assert his 5th Amendment privilege.  O'Neill's involvement in the criminal activity was momentary, over and done within a split second in June 2010.  Bray's involvement is long-standing and ongoing six years later.

In light of these stark differences between the two alleged co-conspirators, and the absence of evidence of any ongoing joint criminal activity between O'Neill and Bray following the passing of the napkin, it is not surprising that Bray's jury found him guilty of insider trading, but not guilty of conspiracy.  We ask that Mr. O'Neill's sentence be as different from Mr. Bray's as the vast difference between their relative culpability and involvement in the charged conspiracy.

### 3.  O'Neill's Cooperation

The Government has filed a § 5K1.1 motion and memorandum in which it describes Mr. O'Neill's candor and remorse, and explains the "critical" importance of Mr. O'Neill's

cooperation in the case against Mr. Bray.  As the Government makes clear, Mr. O'Neill provided

the Government with "unique insight" into, among other things: (i) the tip itself, including the

nature of the tip, and how and when it was made; (ii) the extent of the friendship between Mr.

O'Neill and Mr. Bray; (iii) Mr. O'Neill's expectation of benefit in passing the tip to Mr. Bray;

(iv) Mr. Bray's knowledge of Mr. O'Neill's insider status; and (v) the specific, tangible and

consequential offers of "quid" that Mr. Bray made in exchange for Mr. O'Neill's "quo."

Without Mr. O'Neill's cooperation it is safe to say, particularly given the uncertainty in the law

that existed at the time Mr. Bray was charged (which was shortly after the Second Circuit's

decision in *Newman*), that Mr. Bray likely would not have been charged at all, and certainly

would not have been convicted.  Indeed, putting Mr. Bray aside, but for Mr. O'Neill's

cooperation, it is unclear whether the Government would have pursued its case against Mr.

O'Neill after the *Newman* decision, or, if it had, whether or how it could have convicted him.[2]

Tipper-tippee insider trading cases, as the Government well knows, are notoriously

difficult to prove. That was true before *Newman*, and if anything it is even more true today.  The

fraud in these cases generally occurs in secret, whispered conversations between friends.  And,

wholly independent of the secrecy, proving state of mind and knowledge regarding a tipper's

expectations or a tippee's knowledge of those expectations is particularly challenging, especially

in cases, like this one, where the tipper receives no pecuniary or other tangible benefit.  Indeed,

---

[2]  In addition to "tak[ing] into account" an "appropriate understanding of relative culpability among defendants in
the same general course of conduct," this Court has in other matters placed great weight on the Government's
§ 5K1.1 motions, and defendants' "appropriate and helpful conduct after [they] were arrested," when imposing
relatively "minimal" sentences.  *See, e.g., United States v. Martin*, Case No. 08-cr-10338-WGY, Sentencing
Excerpt, at 2:20-3:15 (D. Mass. Sept. 10, 2012) (imposing one year probation after considering Government's
§ 5K1.1 motion (Dkt. No. 24) requesting one year of community confinement in a case with a guidelines sentencing
range of 24-30 months).  If probation, a sentence lower than the government's § 5K1.1 recommendation, was
appropriate in *Martin*, where defendant's cooperation consisted of nothing more than meeting with government
attorneys and agents and providing them with helpful information and documents, then surely it is also appropriate
here where the government is recommending probation, and defendant's cooperation was critical and far more
substantial than Martin's, and included testimony under oath at trial.

ACTIVE/85860631.1

more often than not, tipper-tippee cases, no matter how egregious the wrong, cannot be prosecuted without the aid of credible cooperators. This case, if anything, is a model example.

If these important cases are to be prosecuted, and the securities markets protected against fraud, it is especially important to recognize the import of cooperation like that of Mr. O'Neill's and to effectively reward it in the context of sentencing. After all, the best way to encourage other potential cooperators to come forward is to show them that cooperation is recognized in sentencing. As the Government explains, there is a genuine public policy reason to recognize and reward cooperation and substantial assistance like that provided by Mr. O'Neill here. *See* Gov't Mem. at 12-13. The best way to serve this public policy is to mete out sentences to cooperators that stand in sharp contrast to those given to non-cooperators such as Mr. Bray.

In addition to considering the critical importance of Mr. O'Neill's testimony in Mr. Bray's prosecution, and considering the general import of rewarding cooperators in insider trading cases, there are two other reasons why Mr. O'Neill's cooperation should be given special consideration by the Court: (i) the risk Mr. O'Neill ran in cooperating; and (ii) the primary reasons for his decision to cooperate.

*Risk of Cooperation* – This was obviously not a case in which Mr. O'Neill needed to fear for his safety or that of his family by cooperating against Mr. Bray. After all, there is no evidence that Mr. Bray has ever been a violent or physically dangerous man. But, here, there was a real risk that by cooperating against Mr. Bray, a/k/a "Bubba," who, according to the evidence at Bray's trial, is an extremely popular member of the Oakley Country Club, Mr. O'Neill would make himself into a social pariah at Oakley, a club that had been the centerpiece of the O'Neill family social life for two decades. In fact, the O'Neills were so concerned over the potential social ramifications of Mr. O'Neill's testimony in "Bubba's" trial that they took a

16

leave of absence from the club, and may never return.  In other words, Mr. O'Neill has accepted, and unilaterally self-imposed, the risk (if not the reality) of pariah status, as a cost of cooperation.  We request that his willingness to risk the sacrifice of his Country Club social life, which has long been near and dear to his whole family, in order to provide candid and truthful testimony, be considered as a factor in his sentencing.

*Reason for Cooperation* – Often the sole reason why defendants or unindicted co-conspirators cooperate with the Government in criminal cases is to obtain a personal benefit, namely, a § 5K1.1 motion and a lower sentence.  The me-first, selfishness of "cooperation" is the reason cooperators are often pejoratively called "rats."   But Mr. O'Neill's reasons for cooperation had little to do with wanting to get the best deal for himself.  The overwhelming reasons for his cooperation were and remain his sincere recognition that what he did was wrong, and that by giving Mr. Bray a secret stock tip he had not only breached his duty of confidentiality to his employer, but had enabled Mr. Bray to defraud innocent investors.  He knew that by giving Mr. Bray the tip, he had allowed him to cheat, which is something that runs counter to every moral and ethical fiber in Mr. O'Neill's being, and runs counter to his entire self-image.  Mr. O'Neill decided to cooperate because he was having real trouble living with himself without accepting full responsibility for what he had done, and without setting the record straight.  He felt as if the only way to set things right would be to tell the truth, and let the chips fall where they may.  If he had simply wanted to get the best deal for himself, he would have held off on pleading guilty and agreeing to cooperate until after the Second Circuit decided *Newman*, which was pending and known to Mr. O'Neill before he signed his cooperation agreement and pled guilty.  But that was not his motive.  His motive was a combination of doing

what he knew to be right, and, through example, helping dissuade others from engaging in insider trading in the future.

**4.  <u>The Sentencing Guidelines</u>**

As the Government notes, "'The guidelines, though advisory, constitute a starting point for the fashioning of a sentence.'"  Gov't Mem. at 5 (quoting *United States v. Fernandez-Garay*, 788 F.3d 1, 6 (1st Cir. 2015)).  The Probation Office calculates Mr. O'Neill's advisory guidelines total adjusted offense level to be 17, with a guidelines' sentencing range of 24-30 months, given Mr. O'Neill's lack of a criminal history.  *See* PSR at ¶¶ 39 & 100.  Independent of USSG § 5K1.1 and Mr. O'Neill's cooperation for which he should receive credit within the guidelines, there are at least three other reasons why the Probation Office's guidelines' calculation is either wrong and/or should result in a downward departure under the guidelines, *i.e.*, even before any of the § 3553(a) factors are considered.

First, as the Government notes, "O'Neill did not share in Bray's trading profits."  Gov't Mem. at 6.  The guidelines calculation in the PSR is driven by the amount of Bray's trading profits.  *See* PSR at ¶ 29.  But these were Bray's profits, not O'Neill's.  Without attributing Mr. Bray's profits to Mr. O'Neill, Mr. O'Neill would not receive the 12 level enhancement that comes with those profits, and his base offense level would be 8, and his guideline sentencing range ("GSR") would be 0-6 months.

Second, although as part of the conspiracy, Mr. O'Neill expected Mr. Bray to purchase Wainwright stock, he had no idea as to the amount of stock Mr. Bray would purchase, let alone the amount of profit Mr. Bray would ultimately obtain.  Mr. O'Neill has acknowledged, based on information learned after the fact, that Mr. Bray's profits ultimately totaled about $300,000.  But he has not admitted to having expected Mr. Bray to buy any particular amount of Wainwright

stock.  Thus, under this Court's sentencing protocol, before the 12-level enhancement associated

with Mr. Bray's profits may be attributed to Mr. O'Neill, the Government must prove beyond a

reasonable doubt that Mr. O'Neill had an expectation not just that Bray would trade in

Wainwright, but that he also had an expectation as to the volume of Bray's trades.  This proof is

impossible, as there was never any expectation as to volume.  Accordingly, per this Court's

sentencing protocol, the 12-level enhancement may not be attributed to Mr. O'Neill, leaving his

base offense level at 8, and his GSR at 0-6 months.

Third, pursuant to USSG § 5K2.20 ("Aberrant Behavior (Policy Statement)"), the Court

"may" and we would suggest should "depart downward."   This policy statement – § 5K2.20(b) –

provides in pertinent part:

> REQUIREMENTS – The court may depart downward under this
> policy statement only if the defendant committed a single criminal
> occurrence or single criminal transaction that (1) was committed
> without significant planning; (2) was of limited duration; and (3)
> represents a marked deviation by the defendant from an otherwise
> law-abiding life.

As the Government has acknowledged, "O'Neill's crime was completed the moment he passed

the tip."  Gov't Mem. at 9.  The crime was plainly a "single criminal occurrence," and as

discussed in detail above and in the Government's sentencing memorandum, it was committed

with no planning, had a duration of a split second, and represented, as the Government put it,

"quite literally, a momentary aberration in an otherwise unimpeachable life" (id.).  If ever there

was a case deserving of a downward departure within the § 5K2.20 policy statement for aberrant

behavior, this is it.  *See, e.g., U.S. v. Mellert*, Case No. CR-03-0043-MHP, 2003 WL 22025007

(N.D. Cal. July 30, 2003) (downward departure in insider trading case where, among other

things, the "offense itself involved one phone call" leading to the insider trade at issue, and was

not "a case of unmitigated greed," but rather, "a marked deviation from what has been not just a

ACTIVE/85860631.1

law-abiding life, but an exemplary one"); *U.S. v. Suarez-Reyes*, Case No. 8:12-cr-67, 2012 WL

6597814 (D. Neb. Dec. 18, 2012) (imposing one day imprisonment where guideline range was

27-33 months because: defendant's misconduct represented a marked deviation from an

otherwise law-abiding life; the illicit conduct occurred over the course of fourth months but still

could be characterized as a single occurrence and did not involve significant planning; and

defendant had no criminal history, accepted full responsibility, and exhibited remorse).

    5.  **The Recommended Sentence Complies with the Purposes of Sentencing**

       A.  **Reflecting the Seriousness of the Offense, Promoting Respect for the Law, and Providing Just Punishment**

Pursuant to 18 U.S.C. § 3553(a)(2)(A), the sentence imposed must "reflect the

seriousness of the offense, . . . promote respect for the law, and . . . provide just punishment for

the offense." Here, the recommended sentence of one year probation and no fine, when viewed

against the backdrop of the facts and circumstances of the offense and the history and

characteristics of Mr. O'Neill, constitutes a fair and just sentence.

Mr. O'Neill recognizes that conspiracy to commit securities fraud is a serious offense,

and that if viewed in a vacuum a sentence of probation and no fine would not adequately reflect

that seriousness. But sentences may not be meted out in a vacuum. Rather, they must take

context into consideration. After all, it is not the offense, whatever the name or label of the

particular offense, that is being sentenced in isolation. It is the particular offender being

sentenced for the offense. *See, e.g., Pepper v. U.S.*, 562 U.S. 476, 487-88 (2011) ("It has been

uniform and constant in the federal judicial tradition for the sentencing judge to consider every

convicted person as an individual and every case as a unique study in the human failings that

sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. . . . Underlying

ACTIVE/85860631.1

this tradition is the principle that the punishment should fit the offender and not merely the crime.") (internal citations and quotation marks omitted).

Here, the recommended punishment of one year probation would come on top of punishment Mr. O'Neill has already received, as well as additional punishment he is likely to receive in the future. The prior punishments, as discussed in detail above, include: (i) the 21 months Mr. O'Neill has already effectively been on probation in the form of pretrial conditions of release; (ii) Mr. O'Neill's loss of two jobs, first with Eastern Bank, and then TD Bank; (iii) the loss of over $2,500,000 in expected income and benefits; (iv) the career death sentence Mr. O'Neill has received; (v) the loss of financial security and the loss of any ability to retire; (vi) the depletion of Mr. O'Neill's 401k assets to supplement income, and help pay legal fees and mounting debt; (vii) the regret, remorse, ███████████████████████████ ███████ that have plagued Mr. O'Neill since 2010; and (viii) the permanent harm to Mr. O'Neill's reputation and social standing within his community. In addition, as explained above, Mr. O'Neill faces additional punishment, including the prospect of having to pay fines that he can ill afford, in actions that have or will be brought by both the SEC and the FDIC.

While a one-year period of probation might not ordinarily reflect the seriousness of the offense of conspiracy to commit securities fraud, on top of Mr. O'Neill's other punishments, it would do so. In addition, such a sentence would also promote respect for the law by recognizing the stark differences between Mr. O'Neill's role in the conspiracy and that of Mr. Bray, and by also recognizing the fact that Mr. O'Neill obtained no tangible benefit from his crime, which was, as the Government has stated, "quite literally a momentary aberration in an otherwise exemplary life." Gov't Mem. at 9.

### B.  <u>Specific and General Detterence</u>

The recommended sentence would also "afford adequate deterrence to criminal conduct"

within the meaning of 18 U.S.C. § 3553(a)(2)(B).  With regard to specific deterrence, there can

be no doubt that Mr. O'Neill has learned his lesson, and will never again commit any crime.  As

noted, the crime was a momentary aberration in what has otherwise been not just a law-abiding

life, but a life of distinction.  Plus, notwithstanding the momentary nature of the crime, its effects

on Mr. O'Neill have been long-lasting and transformative.  The offense lasted a second, but the

regret and remorse ███████████ that resulted from it have been permanent – experienced daily,

indeed every minute, for six years and counting.  As a result of the offense, Mr. O'Neill will

never again work as an executive in a bank, and he will never again have access to material, non-

public information that could affect the securities markets.  But even if he were to have such

access, his conduct in this matter (*e.g.*, declining Mr. Bray's offers of monetary benefit, resigning

from Eastern rather than lie) and the emotional and financial effects the crime has had on him

and his family (as attested to by his 31 letters of support), make clear that he would never again,

even for a second, entertain committing securities fraud or any other crime.

With regard to general deterrence, in the abstract a sentence of one year probation might

not deter others from engaging in securities fraud.  But general deterrence, like just punishment,

may not be considered in the abstract.  *See, e.g., United States v. Miller*, 589 F.2d 1117, 1139

(1st Cir. 1978) (although "general deterrence is a permissible consideration," it "cannot justify

'mechanistic' imposition of stiff sentences").  Rather, the principle must be considered against

the backdrop of Mr. O'Neill's other punishments, both past and future.  *See, e.g., United States v.

Jimenez-Rivera*, 842 F.2d 545, 548 (1st Cir. 1988) ("This court will overturn a sentence where

the facts indicate that the court below adopted a rigid, mechanistic approach to sentencing, and

failed to consider the individual mitigating circumstances of [the] defendant.").  Furthermore, the general deterrent effect of the sentence must be balanced against Mr. O'Neill's cooperation and the importance of encouraging cooperation in tipper-tippee insider trading cases, where the very nature of the offense often makes detection and law enforcement impossible without cooperating witnesses.  Properly balancing general deterrence against the public interest served by Mr. O'Neill's cooperation, and taking into account Mr. O'Neill's other punishments as well as the fact that Mr. O'Neill received no monetary or other tangible benefit from the crime and that the crime was momentary, it becomes clear that the recommended sentence of one year probation would be sufficient to meet the need for general deterrence.

### C.  Protection of the Public

There is no doubt that the recommended sentence, or no sentence at all, would "protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  There is no need for physical protection, as Mr. O'Neill has never been violent or posed any physical danger to any member of the public.  Further, Mr. O'Neill's lifetime bar from FDIC-insured banking, and the near impossibility that he will ever again be in possession of material, non-public information that could affect the securities markets, make it clear that even if he were inclined (which he most definitely is not) to engage in securities fraud, he will never again have the opportunity to do so as a tipper.  In addition, everything else Mr. O'Neill has ever done in his life, as well as his response to the momentary lapse of judgment that brought him before this Court (*e.g.*, his declination of offers of tangible benefit from Mr. Bray, his resignation from Eastern, and his prompt post-arrest cooperation), establish that the risk of Mr. O'Neill ever again committing any crime is non-existent.

 Furthermore,

to the extent that Mr. O'Neill needs educational or vocational training or other correctional

treatment to help him transition to employment outside of the financial services industry which

he served with distinction for over three decades, that training and treatment would be more

readily available and accessible outside of the Bureau of Prisons than within.

## <u>CONCLUSION</u>

The sentence of one year probation and no fine that is being recommended both by the

Government and Mr. O'Neill, properly balances the public interest in general deterrence and just

punishment with the public interest in encouraging cooperation in white collar cases, particularly

insider trading cases.  The proposed sentence is "sufficient, but not greater than necessary, to

ACTIVE/85860631.1

comply with the purposes [of sentencing] set forth in" 18 U.S.C. 3553(a)(2). And, wholly independent of § 3553(a), the sentence would constitute an appropriate guideline sentence considering the aberrant and momentary nature of Mr. O'Neill's offense, and the fact that Mr. O'Neill did not foresee the amount of Mr. Bray's trading in Wainwright stock, and received no monetary or other tangible benefit whatsoever from Mr. Bray's trades.

In light of all of the facts and circumstances of this case, the parties' jointly proposed sentence is fair and just. Mr. O'Neill requests that the Court impose the requested sentence.

Respectfully submitted,

John Patrick O'Neill

By his attorneys,

/s/ David J. Apfel
David J. Apfel (BBO # 551139)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
T: 617.570.1970
F: 617.523.1231
dapfel@goodwinprocter.com

Dated: May 11, 2016

ACTIVE/85860631.1

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to non-registered participants by first class mail on May 11, 2016.

            /s/ David J. Apfel